[807 NE2d 869, 775 NYS2d 757]

RAY EVANS et al., Appellants, v FAMOUS MUSIC CORPORATION, Respondent.

Argued January 6, 2004; decided February 24, 2004

POINTS OF COUNSEL

*McLaughlin & Stern, LLP,* New York City (*David Blasband* of counsel), for appellants. I. The Appellate Division erred in reversing motion court's conclusion that the songwriters' contracts unambiguously require Famous Music Corporation to share the benefits of the foreign tax credit with the songwriters. (*Wendel Found. v Moredall Realty Corp.,* 282 NY 239; *Rudd v 176 W. 87th St. Owners Corp.,* 283 AD2d 202; *Fairfax Co. v Whelan Drug Co.,* 105 AD2d 647; *1100 Ave. of Ams. Assoc. v Bryant Imports,* 234 AD2d 101; *S.B.S. Assoc. v Weissman-Heller, Inc.,* 190 AD2d 529; *Ran First Assoc. v 363 E. 76th St. Corp.,* 297 AD2d 506; *Keasby & Mattison Co. v Rothensies,* 133 F2d 894, 320 US 739; *Greenfield v Philles Records,* 98 NY2d 562; *Woodmere Academy v Steinberg,* 41 NY2d 746; *Uribe v Merchants Bank of N.Y.,* 91 NY2d 336.) II. Even if the contracts are ambiguous, rules of contract interpretation compel the construction urged by the songwriters. (*Jacobson v Sassower,* 66 NY2d 991; *Rentways v O'Neill Milk & Cream Co.,* 308 NY 342; *Fleischman v Furgueson,* 223 NY 235; *A.J. Cerasaro, Inc. v State of New York,* 97 AD2d 598; *City of New York v Brooklyn Union El. R.R. Co.,* 182 App Div 507; *Continental Cas. Co. v Rapid-American Corp.,* 80 NY2d 640; *Matter of Gerseta Corp. v Silk Assn. of Am.,* 220 App Div 293; *Matter of Reuters Ltd. v Dow Jones Telerate,* 231 AD2d 337; *Schlanger v Hayman,* 185 App Div 599; *McDonald v Acker, Merrall & Condit Co.,* 192 App Div 123.)

*Loeb & Loeb, LLP,* New York City (*Jonathan Zavin* and *Alyson M. Weiss* of counsel), for respondent. I. The plain language of the contracts does not entitle plaintiffs to receive the "benefit" of any foreign tax credits. (*Uribe v Merchants Bank of N.Y.,* 91 NY2d 336; *731 W. Lake Rd. v Boheen,* 58 AD2d 1038; *Morlee Sales Corp. v Manufacturers Trust Co.,* 9 NY2d 16; *Matter of Caruso v Ward,* 146 AD2d 22; *Breed v Insurance Co. of N. Am.,* 46 NY2d 351; *Rodolitz v Neptune Paper Prods.,* 22 NY2d 383; *8-14 W. 38th St. Corp. v W. & J. Sloane,* 181 AD2d 545.) II. Plaintiffs' contract construction is contrary to the decisions of other courts to have considered this issue. (*Surge Licensing v Copyright Promotions,* 258 AD2d 257; *Croce v Kurnit,* 737 F2d 229; *Fairfax Co. v Whelan Drug Co.,* 105 AD2d 647; *Wendel*

*Found. v Moredall Realty Corp.*, 282 NY 239; *Mir v Mir,* 135 AD2d 690; *Albany Sav. Bank, FSB v Halpin,* 117 F3d 669; *DeVanzo v Newark Ins. Co.*, 44 AD2d 39, 37 NY2d 733; *Matter of Caruso v Ward,* 146 AD2d 22; *Greenfield v Philles Records,* 98 NY2d 562.) III. Even if the contracts are ambiguous, the undisputed evidence of the parties' intent compels the construction urged by Famous Music Corporation. (*Federal Ins. Co. v Americas Ins. Co.*, 258 AD2d 39; *Town of Pelham v City of Mount Vernon,* 304 NY 15; *Continental Cas. Co. v Rapid-American Corp.*, 80 NY2d 640; *Mallad Constr. Corp. v County Fed. Sav. & Loan Assn.*, 32 NY2d 285; *Schechter Assoc. v Major League Baseball Players Assn.*, 256 AD2d 97; *Edelman v Robert A. Becker, Inc.*, 194 AD2d 507; *AJ Contr. Co. v Trident Mgrs.*, 234 AD2d 195; *731 W. Lake Rd. v Boheen,* 58 AD2d 1038; *Bernstein v Felske,* 143 AD2d 863; *Mocca Lounge v Misak,* 94 AD2d 761.)

*Paul, Weiss, Rifkind, Wharton & Garrison LLP,* New York City (*Carey R. Ramos* and *Lauren A. McMillen* of counsel), for National Music Publishers' Association Inc., amicus curiae. I. Appellants' novel interpretation of their long-standing contracts cannot be what the contracting parties intended. (*Nassau Ch., Civ. Serv. Empls. Assn. v County of Nassau,* 77 AD2d 563; *Shirai v Blum,* 239 NY 172; *Kasen v Morrell,* 6 AD2d 816; *Matter of Reuters Ltd. v Dow Jones Telerate,* 231 AD2d 337; *Rooney v Columbia Pictures Indus., Inc.*, 538 F Supp 211; *Zodiac Enters. v American Broadcasting Cos.*, 56 NY2d 738.) II. Appellants' novel interpretation, if adopted, would be inequitable to parties who have been successfully dealing with each other under the contracts at issue for over 40 years. (*John Doris, Inc. v Guggenheim Found.*, 209 AD2d 380; *Lindsey v Normet,* 405 US 56; *Lang v Pataki,* 176 Misc 2d 676; *Bartsch v Metro-Goldwyn-Mayer, Inc.*, 391 F2d 150.)

**OPINION OF THE COURT**

G.B. SMITH, J.

This action involves the interpretation of a provision in six music royalty contracts detailing the manner in which income from the exploitation of songs must be apportioned between the plaintiff songwriters and defendant Famous Music Corporation. Specifically, the question is whether the contract provision obligates Famous to share with plaintiffs certain tax savings resulting from foreign tax credits. We answer the question in the negative.

I.

Ray Evans, Henry Mancini, Johnny Mercer and Richard Whiting are legendary writers of American popular music, particularly music for movies. Famous is a music publisher that Paramount Pictures (Famous's predecessor-in-interest) established in 1928 to market music from its films. Famous today is a subsidiary of Viacom.

On August 9, 1945, plaintiff Ray Evans entered into a six-month employment contract with Paramount as a staff writer, composer and arranger. Paramount also agreed to pay Evans additional income based on the exploitation of any songs or music he composed pursuant to the contract. On August 31, 1960, Henry Mancini entered into a similar contract with Paramount, the second contract in issue in this case. Mancini's services under the contract dealt with the movie "Breakfast At Tiffany's" and its accompanying song, "Moon River," for which Johnny Mercer wrote the lyrics pursuant to the third contract in this action. Mancini entered into two additional contracts—the fourth and fifth at issue—one for the movie "Hatari," the other in 1981 with Paramount for the movie "Mommie Dearest."

Finally, the sixth contract before us, dated November 9, 1959, was entered into between Paramount and the widow and two daughters of Richard Whiting for works he had composed. The contract is a settlement agreement resolving past royalty disputes. The contract is dated November 1959, and covers numerous songs co-authored by Richard Whiting.[1]

All six contracts contain the following substantially identical provision, which requires that Famous pay the songwriters

> "[f]or both words and music an amount equal to fifty per centum (50%) of all net sums actually received by the Corporation with respect to such song or musical composition from any other source or right now known or which may hereafter come into existence (except small performing rights and except as provided in the next following paragraph hereof), less all expenses and charges in connection with administering said rights or collecting such sums . . . and less all deductions for taxes."

---

1. Except for Ray Evans, plaintiffs are successors-in-interest to the songwriters. Famous is the assignee of the rights to exploit the songs under the contracts at issue.

Basing their lawsuit on this provision, plaintiffs allege that Famous breached its obligation to reimburse them for their proportional share of tax credits Famous received for the payment of foreign taxes. The complaint alleges that for the years it realized profit for the overseas exploitation of its music, Famous paid taxes to the foreign governments involved and regularly received the benefit of foreign tax credits on its United States tax returns. Plaintiffs claim that under the above-quoted provision, they are entitled to half of the value of the foreign tax credits Famous received.

Famous moved for summary judgment arguing that (1) the plain meaning of the provision does not support plaintiffs' right to recover the damages they seek; (2) because of past custom and practice in the industry, plaintiffs are not entitled to recovery; and (3) had the parties intended for the plaintiffs to receive such a benefit—which involves a complex calculation dependent on numerous factors—they would have explicitly provided for it in their contracts. In support of the motion, Famous submitted the affidavit of its Executive Vice President of Finance and Administration, highlighting the uncertainty and complexity surrounding the foreign tax credit, and explaining that it was inconsistent with the performance of the parties and industry practice involving similar contracts for publishing companies to credit or share the benefit of any foreign tax credit.

Plaintiffs cross-moved for partial summary judgment, offering the affidavit of a certified public accountant explaining how foreign tax credits operate. Plaintiffs also submitted the affidavit of the Executive Director of the Songwriters Guild of America (SGA), stating that, in 1997, he wrote to Famous and other companies inquiring about the use of foreign tax credits, but received no adequate answer. Famous then responded with the affidavit of a certified public accountant who specializes in the recording/entertainment industry. The accountant was not aware of any music publishing company that interpreted the standard term "all net sums received" or "all net sums actually received" to include the value or benefit of a foreign tax credit. He opined that, in order for a company to make payments relating to tax credits, it would have to agree specifically to do so. He further stated that the calculation of foreign tax credits on a song-by-song basis "would be extremely difficult and impractical, if not impossible."

Supreme Court granted plaintiffs' motion for partial summary judgment, holding Famous liable under the contracts. The

court reasoned that since Famous suffers no loss when a tax payment is credited, "there is no justification for deducting the foreign tax payments from the gross receipts when calculating the 'net sums' upon which plaintiffs' royalty payments are based." The court found the contractual provisions at issue unambiguous and saw no need to rely on extrinsic evidence. In addition, the court held that the complexities surrounding computation of the foreign tax credits did not relieve Famous of its contractual obligation to share the benefits with plaintiffs. The Appellate Division reversed, concluding that "the benefit of any foreign tax credit was not contemplated by the parties" since the contracts identified the payments plaintiffs were entitled to, but omitted any mention of foreign tax credits. (302 AD2d 216, 217 [2003].) We now affirm.

II.

Unlike many of its trading partners, the United States taxes its citizens and residents on their worldwide income. The foreign tax credit was enacted in 1918 to prevent American companies from being taxed both by the United States and by the foreign country in which the income is generated. Without the credit, United States companies doing business abroad would be at a distinct disadvantage with foreign companies that are not taxed on their foreign income. Generally, where the foreign tax liability is lower than the United States tax liability, the taxpayer will still have a United States tax liability. Where the foreign tax liability is higher than the United States tax liability, the taxpayer will have excess credit. Excess credits may also result from limits on the use of credits.

Application of the foreign tax credit is complex, even by tax standards. As Famous and amicus National Music Publishers' Association emphasize, there are numerous technicalities surrounding the use of the credit. For example, the credit cannot be used to decrease United States taxes on United States source income (Internal Revenue Code [IRC] [26 USC] § 904 [a]). Credits and foreign source income must be categorized into different so-called "baskets" which may not be combined (IRC § 904 [d] [1]). The credit is elective, and excess credit may be carried back two years and forward five years. These technicalities make the foreign tax credit "one of the most intricate and convoluted features of the entire U.S. tax system" (Kaplan, Federal Taxation of International Transactions, at 81 [West Publishing 1988]; *see also* Graetz, *The David R. Tillinghast*

*Lecture, Taxing International Income: Inadequate Principles, Outdated Concepts, and Unsatisfactory Policies,* 54 Tax L Rev 261, 264 [2001]). Here, the calculation is even further complicated by inserting Viacom (the entity that would take the credit) into the picture, by classifying royalties as either passive income or general limitation income, by calculating the credit limit allowed under each basket, by carrying over and back excess credits, by potential redeterminations years later, and by a host of other factors.

While a highly complex tax matter, the law issue before us is a simple and familiar one: how should the parties' contract be interpreted? To phrase it differently, does the obligation to pay half of "all net sums actually received . . . less all deductions for taxes" require Famous to pay half of any tax savings to Famous resulting from the use of the foreign tax credit?

It is well settled that our role in interpreting a contract is to ascertain the intention of the parties at the time they entered into the contract. If that intent is discernible from the plain meaning of the language of the contract, there is no need to look further. This may be so even if the contract is silent on the disputed issue. Illustrative is *Greenfield v Philles Records* (98 NY2d 562 [2002]), a case involving a contract between recording artists and their producer. There, the issue was whether the producer could use the master recordings for synchronization and other new technologies even though the contract did not explicitly authorize it. Reading the contract as a whole, and consistent with the rules of contract interpretation, we held that the broad grant of ownership rights, without reservation, included the right to synchronization and other newly developed formats. Had the contract been susceptible to more than one reasonable interpretation, it would have been ambiguous.

The contractual provision in the case before us establishes a mechanism for calculating the sharing of income received from the exploitation of songs. The calculation begins with "all net sums actually received" by Famous from "any other source or right now known or which may hereafter come into existence." From "all net sums actually received," Famous must deduct certain expenses and taxes, and half of the remainder belongs to the artists.

Plaintiffs argue that the language "from any other source or right now known or which may hereafter come into existence" encompasses a foreign tax credit. This clause addresses the

means of exploitation. Yet the credit is not income that Famous receives in exchange for the right to use the songs. The credit is given by the United States government because of a tax policy, not in return for the use of songs. While the credit diminishes tax liability, it is not the same as cash or its equivalent.

Plaintiffs also argue that while the contracts specify certain usages that require no payment to the songwriters as well as expenses that must be deducted, they do not exclude benefits from the foreign tax credit. The argument is based on the maxim that the expression of one thing is the exclusion of another. The maxim, however, does not fit neatly within plaintiffs' interpretation since it would involve placing into the contract a term that was excluded. The argument is a double-edged sword. The contracts provide that the sums specifically provided "represent the total amount which" the songwriters are entitled to. Yet the foreign tax credit is not included. While it is clear that Famous obligated itself to deduct taxes, it is not equally clear that it obligated itself to make payments to the songwriters in the event that the foreign tax credit proved beneficial.

Faced with this ambiguity, we turn to extrinsic evidence for guidance as to which interpretation should prevail. The evidence strongly favors Famous. To begin with, the songwriters have received royalties under these contracts for periods of time ranging from 23 to 59 years, and have never demanded a showing of any credits. When a demand was made, it came in 1997, through a third party, the SGA.[2] The contracts are fully capable of being performed—and have been for decades—without the interpretation now sought by plaintiffs. It is no answer that plaintiffs claim to have been unaware that tax credits were being taken by Famous or that Famous was evasive as to whether there were any. Foreign tax credits have existed since 1918.

Industry custom and practice also favors Famous. Plaintiffs did not refute the accountants' assertions that the language used in the contracts was insufficient to impose on Famous the

2. The record contains several letters between the SGA and Famous. In its initial response, Famous stated that "[a]ny foreign taxes incurred by these subpublishers or withheld from payments due these subpublishers by foreign societies will not even support a claim for foreign tax credit by our company, because these foreign taxes have not been directly imposed or withheld in our name." In addition Famous argued that even if it owned the subsidiary, the taxes would not be paid on the songwriter's name so that the songwriter would not be entitled to the credit. The last letter by Famous states that only with respect to Japanese taxes can Famous obtain the foreign tax credit, and even then Famous could not pass along any credit to the songwriters.

obligation of sharing any benefits resulting from the use of the foreign tax credit with the songwriters. Moreover, when music publishing companies have shared credits with songwriters, they have done so pursuant to an explicit clause.

The industry practice and custom reflects to some extent the generally greater bargaining power of music publishing companies. It also reflects the unlikelihood that a music publisher would assume an onerous obligation without explicitly agreeing to do so, particularly when the obligation is fraught with uncertainty, including how the determination of the benefit should be conducted, how much of the benefit (if any) is attributable to the songwriter, and when and how the benefit would be shared.

In light of the extrinsic evidence, the reasonable interpretation of the contracts before us is that they do not require the sharing of any benefit resulting from defendant's use of the foreign tax credit.

The reasonable expectation of the parties, the wording of the contracts and the industry practice all demonstrate that the foreign tax credits should not result in additional compensation to plaintiffs.

Accordingly, the order of the Appellate Division should be affirmed, with costs.

Read, J. (dissenting). These form contracts obligate respondent Famous Music Corporation, a major music publisher, to pay appellants, a well-known songwriter and the heirs of other well-known songwriters (collectively Songwriters), specified amounts for identified formats in which their work is published in the United States and Canada (e.g., regular piano copies) with identified exclusions (e.g., certain television and film synchronization rights), plus 50% of "all net sums actually received by [Famous] . . . from any other source or right now known or which may hereafter come into existence . . . less all expenses and charges . . . and less all deductions for taxes." Thus, Famous agreed to pay the Songwriters listed royalties plus a catchall royalty consisting of half of any net profit actually realized by Famous from exploitation of Songwriters' musical compositions in ways or places neither specifically delineated in nor excluded by the contract. This contractual scheme is absolutely clear and unambiguous.

To exploit Songwriters' compositions abroad, Famous entered into subpublishing contracts with foreign music publishers. The

foreign subpublishers administer Famous's catalog of songs and collect the royalties; deduct a fee (usually a percentage of the royalties collected) and the taxes imposed by the foreign country; and account to Famous for the balance. Famous pays half of this balance to Songwriters under the catchall royalty provision. Thus, Famous and Songwriters effectively each pay half of the foreign taxes. In certain instances, however, Famous takes a foreign tax credit on its United States income taxes for the full amount of foreign taxes paid on both its own and Songwriters' behalf.[1] Songwriters seek their one-half share of any deductions for foreign taxes actually reimbursed to Famous in this way. This case, then, turns on the meaning of the phrase "less all deductions for taxes."

As we stated in *Greenfield v Philles Records* (98 NY2d 562, 571 [2002]), "[i]f the contract is more reasonably read to convey one meaning, the party benefitted by that reading should be able to rely on it; the party seeking exception or deviation from the meaning reasonably conveyed by the words of the contract should bear the burden of negotiating for language that would express the limitation or deviation" (quoting *Boosey & Hawkes Music Publs., Ltd. v Walt Disney Co.*, 145 F3d 481, 487 [2d Cir 1998]). The word "deduction" means "something that is or may be subtracted" (Merriam-Webster's Collegiate Dictionary 301 [10th ed]). "[L]ess all deductions for taxes" is therefore more naturally read to encompass subtractions for taxes for which Famous is—and remains—out of pocket. If these subtractions are subsequently reimbursed, they are not, in fact, subtractions at all. By disregarding reimbursed tax payments, Famous is calculating the catchall royalty in contravention of a clear and unambiguous contractual scheme, which calls for the parties to split net profits evenly. That the parties in 1945 (the date of the Evans contract) did not identify precise elements (i.e., foreign tax credits) that might bear on how to calculate "all deductions for taxes" in future decades does not render their intent ambiguous.

Finding the contract ambiguous, though, the majority gleans intent from the parties' course of dealing. Principally, the majority considers it critical that Songwriters did not demand "a showing of any credits" until 1997, and then, only by letter from the Songwriters Guild of America (majority op at 459). For the majority, it is not enough that Famous was being "evasive."

---

1. This occurs when the subpublisher pays the foreign taxes in Famous's name directly, as is most notably the case in Japan.

The availability of foreign tax credits under the Internal Revenue Code long predates these contracts; however, Famous does not contend that it was taking advantage of foreign tax credits in Japan or elsewhere when these contracts were signed. The record does not establish when Famous first began employing these credits to reimburse itself for foreign taxes effectively paid by Songwriters. The record does, however, show that Songwriters were unaware that Famous was doing this until shortly before the litigation began. Moreover, Famous was not just "evasive"; Famous repeatedly and emphatically denied using foreign tax credits in response to point-blank inquiries made by the Guild on Songwriters' behalf.[2] As we stated in *Continental Cas. Co. v Rapid-American Corp.* (80 NY2d 640, 651 [1993]), "[i]f ambiguity exists, '[t]o show a practical construction . . . there must have been conduct by the one party expressly or inferentially claiming as of right under the doubtful provision [i.e., Famous], *coupled with knowledge thereof and acquiescence therein, express or implied, by the other* [i.e., Songwriters]' " (citations omitted and emphasis added).

Further, "[i]n New York, all contracts imply a covenant of good faith and fair dealing in the course of performance" (*see 511 W. 232nd Owners Corp. v Jennifer Realty Co.*, 98 NY2d 144, 153 [2002]). The covenant of good faith and fair dealing

> "embraces a pledge that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.' While the duties of good faith and fair dealing do not imply obligations 'inconsistent with other terms of the contractual relationship' they do encompass 'any promises which a reasonable person in the position of the promisee would be justified in understanding were included' " (*id.* [citations omitted]).

This is particularly true in relationships where the parties "do not deal as equals either in terms of access to information or business acumen and thus, . . . often lack equal bargaining power" (*id.* at 154).

---

2. In answer to letters from the Guild, Famous represented that it did not employ foreign tax credits, and was, in fact, legally unable to do so. Only after an audit by the Guild did Famous finally acknowledge its use of foreign tax credits with regard to taxes paid in Japan. Famous's royalty statements to Songwriters did not indicate that Famous was utilizing foreign tax credits and, indeed, did not even show that Songwriters were paying foreign taxes.

Although Songwriters were well-established artists, they were not dealing as equals in terms of access to information with regard to Famous's use of these allegedly extremely complicated foreign tax credits. Famous was therefore under a heightened obligation to honor any promises that Songwriters were justified in relying upon—including the implied promise that "all deductions for taxes" would, in fact, encompass actual, unreimbursed outlays for taxes. The majority, in effect, converts a good faith requirement to account for deductions into a negotiable contract "benefit" that is forfeited if not spelled out in prescient detail and diligently policed.

The majority also contends that the contracts should be construed in accordance with music industry custom and practice by which music publishers apparently now may pay artists a share of foreign tax credits, but only pursuant to an explicit clause.[3] Of course, custom and usage cannot be used to contradict, alter or vary the terms of an unambiguous contract. Furthermore, Famous cannot establish, as it must, that "the party sought to be bound [Songwriters] [were] aware of the custom, or that the custom's existence was 'so notorious' that [they] should have been aware of it" (*British Intl. Ins. Co. Ltd. v Seguros La Republica, S.A.*, 342 F3d 78, 84 [2d Cir 2003]). Again, there is no suggestion that what might constitute music industry custom and practice today was the same when these contracts were signed as long as 60 years ago. Further, I agree with Supreme Court that "the fact that defendants have been successful in breaching a material term of their royalty contracts for years hardly justifies a continuation of such behavior based on custom and usage."

Accordingly, I would reverse the order of the Appellate Division.

Chief Judge KAYE and Judges CIPARICK, ROSENBLATT and GRAFFEO concur with Judge G.B. SMITH; Judge READ dissents and votes to reverse in a separate opinion; Judge R.S. SMITH taking no part.

Order affirmed, with costs.

3. That the music publishing companies are concededly capable of allocating reimbursed foreign tax payments belies Famous's argument that these calculations are too difficult to make.