■ GREEN HARBOUR HOMEOWNERS' ASSOCIATION, INC., Appellant, v G.H. DEVELOPMENT AND CONSTRUCTION, INC., et al., Respondents. [789 NYS2d 319]—

Kane, J. Appeals (1) from an order of the Supreme Court (Sheridan, J.), entered December 26, 2003 in Warren County, upon a decision of the court in favor of defendants, and (2) from the judgment entered thereon.

Plaintiff is a homeowners' association created to own and maintain the common property in a residential subdivision in the Town of Lake George, Warren County, and to enforce the subdivision's covenants and restrictions. Defendants are sponsors, cosponsors, or successors-in-interest of cosponsors of the subdivision. Litigation regarding aspects of the subdivision began early in the project's history (*see Matter of Black v Summers*, 151 AD2d 863 [1989]), and has continued in different forms. Most recently, this Court addressed the parties' summary judgment motions in the instant action (307 AD2d 465 [2003], *lv dismissed* 100 NY2d 640 [2003]), and a CPLR article 78 proceeding commenced by plaintiff (*Matter of Green Harbour*

*Homeowners' Assn. v Town of Lake George Planning Bd.*, 1 AD3d 744 [2003]).* Following those decisions, Supreme Court held a lengthy nonjury trial resulting in dismissal of the remaining causes of action. Plaintiff appeals.

A major issue in this matter is ownership of the ill-defined lot 20. Although everyone agrees that plaintiff is the owner of lot 20, no one can agree on the boundary lines of that lot. Two maps, a paper map filed with the town Planning Board on March 28, 1988 and a Mylar map filed in the County Clerk's office the same day, differ as to whether plaintiff owns in fee a strip of land along the shore of the island abutting plaintiff's docks or whether plaintiff has an easement along that strip half way down the island. Plaintiff contends that the Planning Board map is the official map and the County Clerk's Mylar was improperly altered after Planning Board approval but before filing, constituting a fraud on plaintiff.

The record contains conflicting evidence regarding the parties' intentions as to what was to constitute lot 20, and as to how the changes on the County Clerk's Mylar came about. The town's zoning and code enforcement officer could not remember the specific signing of these maps and testified only regarding his normal procedure. While he stated that he would not have approved the configuration on the Mylar because it was unlawful, he later testified that an easement such as the one on the Mylar would not have violated the town's zoning ordinances. The Planning Board chair could not remember any specifics of March 28, 1988, the day on which he signed the Planning Board map and County Clerk's Mylar, except he specifically remembered signing the Mylar and that it did not look the same when he signed it as it did at trial 16 years later. This testimony was weakened by cross-examination, which established that he signed between 21 and 28 maps or Mylars for this subdivision that same day, and he acknowledged that he only gave a cursory review to the maps he signed.

On the other hand, the surveyor testified that he would never alter a Mylar once it had been signed by the Planning Board, doing so would be a crime, he was asked to make revisions to the Mylar because he had misunderstood the boundaries, and he made those revisions represented on the Mylar before it was presented to the Planning Board. The sponsor's president specifically remembered seeing incorrect boundaries on the Mylar and advising the surveyor to correct it before it was submitted to the Planning Board. Considering that numerous

---

* This Court's prior decisions provide a more detailed history of this action.

maps and Mylars were presented to the Planning Board in haste to meet a filing deadline, it does not strain the imagination to believe that the sponsor mistakenly submitted both the earlier incorrect paper version of the map and the revised Mylar to the Planning Board, along with over 20 other maps and Mylars, and that both were signed and filed in their respective locations. The final environmental impact statement, draft environmental impact statement, subdivision application and notations on other maps all support defendants' position that the Mylar map filed in the County Clerk's office accurately represents what was approved by the Planning Board. We decline to disturb, and give great deference to, Supreme Court's credibility determinations and related factual findings that plaintiff failed to prove that any defendant fraudulently altered the map filed with the County Clerk (see Riggs v Benning, 290 AD2d 716, 717 [2002]; Matter of Roth v S & H Grossinger, 284 AD2d 746, 747 [2001]). As no fraud was proven, the map in the County Clerk's office is the official map providing boundaries for lot 20. Additionally, as plaintiff has not proven fraud, the court properly dismissed plaintiff's cause of action for counsel fees on that basis.

Having found that plaintiff is entitled only to an easement over the dock strip of land up to the boathouse, we now address whether that easement allows vehicular or only pedestrian access. The offering plan contains general language providing each of plaintiff's members "an easement in common with other Members for ingress and egress by vehicle or otherwise, across, over and to all [of plaintiff's] [p]roperty." Another section states that plaintiff "has an easement over the existing roadway leading to the Island and to and from said roadway to the docks located on the Island." A specific section of the offering plan includes a metes and bounds description of the easement. That section provides that the easement "may be exercised only for pedestrian access to docks" on the island and it constitutes a "non-exclusive pedestrian easement." Where a contract, such as the offering plan, employs contradictory language, specific provisions control over general provisions (see Muzak Corp. v Hotel Taft Corp., 1 NY2d 42, 46 [1956]; Matter of Lewiston-Porter Cent. School Dist. v Sobol, 154 AD2d 777, 779 [1989], lv dismissed 75 NY2d 978 [1990]). A contract should be interpreted in a way which reconciles all its provisions, if possible (see Matzen Constr. v Schultz, 257 AD2d 724, 725-726 [1999]).

Following these rules of contract interpretation, plaintiff is entitled to a pedestrian easement to the dock strip in accordance with the more specific provisions of the offering plan. In addition, plaintiff has a vehicular easement over the roadway to

and onto the island for the purpose of members gaining access to their docks. The second above-quoted provision requires this interpretation. Plaintiff owns the roadway leading to the island and could not be granted an easement over its own property. Therefore, the "easement over the existing roadway leading to the Island and to and from said roadway to the docks located on the Island" must be that portion of the island roadway which provides access to the dock easement. This interpretation is supported by the parties' course of dealing which permitted vehicles to travel on the island's roadway for loading and unloading purposes, and representations by the sponsor's salesperson to members that they were permitted to drive onto the island for such purposes. Further, portions of the shoreline are steep and partially obstructed, making a mere pedestrian easement along that strip untenable. Harmonizing the offering plan's separate provisions and the parties' circumstances, a proper delineation of plaintiff's right-of-way includes a vehicular easement over the roadway on the island for loading and unloading purposes and a pedestrian easement in the approximately 15 feet of land between the roadway and plaintiff's docks.

Plaintiff argues that it is entitled to a declaration that its sewage system is not responsible for accepting more than 600 gallons per day of effluent from the island. The offering plan specifically states that the owner of the island is entitled to hook up the mansion and seven residential units on the island to plaintiff's sewage system. There are no conditions on that right to connect, other than the requirement that those using the system must pay sewage and water costs in the same manner as plaintiff's members. The offering plan contains assurances that the sponsor designed plaintiff's sewage plant with sufficient capacity to accommodate the mansion and seven residences on the island. Plaintiff contends that these assurances were called into question by a 1987 sewage engineer's report, referenced in the offering plan, that only estimated 600 gallons of effluent per day from the island, apparently not factoring in the seven potential additional residences. The 600-gallon amount was not listed as a maximum limit, however; the report only listed loading estimates. Plaintiff failed to prove that the current system is insufficient to handle more than 600 gallons from the island. Thus, plaintiff is not entitled to the declaration it seeks regarding the sewage system.

Plaintiff also is not entitled to dock rental income. Its argument is that defendants were unjustly enriched by renting out docks at times after such docks should have been transferred to plaintiff. Planning Board condition 10 specified that the docks

would be conveyed to plaintiff by no later than October 15, 1989. The offering plan was inconsistent with that condition and internally inconsistent; it provided in one place that all of plaintiff's property would be turned over upon the sale of the first unit in the subdivision, in another provision that the cosponsor had the right to use and rent the docks until a unit was under sale contract, and in another provision that one third of dock spaces reserved for plaintiff's members would be transferred in each year of 1989, 1990 and 1991. The latter plan was apparently devised in anticipation of the subdivision being completely built out by 1991. As this did not happen, the sponsors provided a ninth amendment to the offering plan in 1994, acknowledging that the dock spaces had not been turned over by 1991 and instead the sponsor would retain each dock until a unit entitled to such dock was conveyed to a purchaser, consistent with one of the inconsistent provisions of the offering plan. This procedure was followed, with defendants renting the docks and being responsible for maintenance and insurance on the docks they retained.

Plaintiff contends that defendants could not unilaterally amend the offering plan, thus altering the contract between the sponsors and purchasers, plaintiff's members. The offering plan permitted the sponsor to alter it through amendments filed with the Department of Law, as required by regulation (*see* 13 NYCRR 22.5 [a]). Testimony established that the ninth amendment was submitted to the Department of Law and, although there was conflicting testimony, the amendment was apparently served on the plan's offerees (*see* 13 NYCRR 22.5 [a] [6]; 22.1 [d]). Regulations require that "[i]f there is a material amendment to the offering plan that adversely affects the purchasers, sponsor must grant purchasers a right of rescission" (13 NYCRR 22.5 [a] [5]). Although it is uncertain whether the delayed turnover of docks to plaintiff for units not yet purchased can be considered "a material amendment" or one that "adversely affects the purchasers," and it is unclear whether the sponsors offered any purchaser the right of rescission, there is no proof that any purchaser ever sought to rescind on the basis of the ninth amendment before or during this action. Given that the sponsor was lawfully permitted to amend the offering plan and did so according to the regulations, the purchasers' only remedy, if they were dissatisfied with the amendment, was to seek rescission as permitted by the regulations. Based on the regulations, the unchallenged ninth amendment and one of the originally-conflicting provisions of the offering plan, plaintiff is not entitled to recover dock rental income.

Defendants correctly point out that plaintiff's amended

complaint did not request a declaration that defendants are only entitled to dock 17 boats in the harbor; thus, that issue is not properly before us. Plaintiff's remaining contentions have been reviewed and do not merit reversal.

Spain, J.P., Mugglin and Lahtinen, JJ., concur. Ordered that the order and judgment are modified, on the facts, without costs, by defining plaintiff's easement on Cooper Point Island as (1) a vehicular easement over the roadway along the shore for the purpose of plaintiff's members gaining access to their docks and (2) a pedestrian easement between the roadway and plaintiff's docks; and, as so modified, affirmed.