

Villanova University Charles Widger School of Law Digital Repository

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-7-2006

# Peak Partners LP v. Republic Bank

Precedential or Non-Precedential: Non-Precedential

Docket No. 05-2242

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Peak Partners LP v. Republic Bank" (2006). *2006 Decisions.* Paper 610.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/610

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 05-2242

———————

PEAK PARTNERS, LP,
                                              Appellant

v.

REPUBLIC BANK; U.S. BANK TRUST NATIONAL ASSOCIATION

———————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
D.C. Civil No. 02-cv-01831
District Judge:  The Honorable Freda L. Wolfson

———————

Submitted Under Third Circuit LAR 34.1(a)
June 27, 2006

———————

Before: SCIRICA, Chief Judge, BARRY, and VAN ANTWERPEN, <u>Circuit Judges</u>

———————

(Opinion Filed:  August 7, 2006)

———————

OPINION

———————

BARRY, <u>Circuit Judge</u>

Plaintiff Peak Partners, L.P. ("Peak"), an investment hedge fund, purchased mortgage-backed securities issued by Keystone Owner Trust 1998 P-2 ("the Trust"), which it claims were devalued by the negligence of the Trust's Servicer, Republic Bank ("Republic"), and Indenture Trustee, U.S. Bank Trust National Association ("U.S. Bank"). At the conclusion of discovery, the District Court granted summary judgment in favor of defendants. For the reasons that follow, we will affirm.

## I. Background

### A. Facts

The Trust was created on August 31, 1998 pursuant to a trust agreement between the owner trustee, First Union Trust Company, N.A., and the seller, Keystone Mortgage Corporation ("Keystone"). The assets of the Trust consist primarily of a securitized pool of residential second mortgage loans. The Trust issued various classes of notes in the over-the-counter market, which entitled their holders to monthly distributions based on either the principal or interest payments made by borrowers on the loans in the pool.

Defendant Republic's duties as servicer are defined by a Sales and Servicing Agreement ("SSA") it entered into with the Trust, Keystone, and U.S. Bank. Those duties include collecting payments on mortgage loans, forwarding those payments to a collection account, and reporting to the Indenture Trustee the amount of interest and principal collected on the loans in a monthly Servicer Certificate. Pursuant to an Indenture agreement ("Indenture"), defendant U.S. Bank is responsible for, among other

2

things, making monthly distributions to the Trust's noteholders from the funds in the collection account.

On December 10, 1999, Peak, through the brokerage firm Bear Sterns & Company, Inc. ("Bear Sterns"), invested $4,275,000 in the Trust's notes, at $57.00 per note. The class of notes purchased entitled Peak to receive only interest distributions from the Trust. The investment was attractive to Peak, in large part, because the Trust's overcollaterization amount—that is, the funds in the Trust in excess of the amount it was obligated to distribute to investors—was reported by U.S. Bank to be over $40,000,000 in its monthly "Statement to Noteholders." Peak considered the overcollateralization amount to be a key indicator of whether its investment would be able to withstand an economic downturn.

In May 2000, U.S. Bank discovered that there were insufficient funds in the collection account to make its required monthly distribution to noteholders. U.S. Bank contacted Republic, and found, after an investigation, that the account was depleted because U.S. Bank had overpaid principal payments to noteholders every month since the Trust's first distribution in October 1998. U.S. Bank was using Republic's Servicer Certificate to calculate the amount of money available to distribute from the collection account. That document, however, failed to reflect the servicing fee—approximately $500,000—that Republic was deducting every month before entering received mortgage payments into the collection account. Specifically, a line in the Servicer Certificate entitled "Net Interest collected on Mortgage Loans during the preceding Due Period"

3

actually reflected the *gross* interest Republic collected.[1]  (App. 1024-25, 1597.)  Due to its reliance on this figure, U.S. Bank made a total of $10,106,728 in overpayments over the course of a 19-month period.

U.S. Bank sent a notice to the Trust's noteholders on June 13, 2000.  The notice informed them of the overpayments, and proposed to "offset prepayments of principal already distributed on the Notes against principal hereafter coming due on the notes" for approximately three months in order to replenish the collection account.  (App. 1159-60.)  "Because the Noteholders received a portion of their principal ahead of schedule," the notice read, U.S. Bank did "not believe the Noteholders were damaged or suffered any economic loss as a result of the error."  *Id.*

Bear Sterns disagreed with this assessment.  In a letter dated August 14, 2000 to U.S. Bank on behalf of its noteholder clients, including Peak, Bear Sterns pointed out that the error caused U.S. Bank to overstate the Trust's overcollateralization amount by over $10,000,000, and that as this figure declines, so does the market value of the notes.  To prevent this devaluation, Bear Sterns proposed that either U.S. Bank or Republic post a letter of credit of $10,106,728 to the Trust until the collection account was replenished.  Both U.S. Bank and Republic rejected this proposal.

Due in part to the now reduced overcollateralization amount in the Trust, Peak sold

---

[1] The Servicer Certificate does note Republic's "Servicer Fee" in a line item later in the document, but this figure is never subtracted from the "Net Interest collected" upon which U.S. Bank relied.  (*See*, *e.g.*, app. 1590-93.)

4

all of its Keystone notes in two different sales. On March 14, 2001, it sold a group of notes for $2,055,000 at $68.50 per note. In November 2001, it sold the remainder of its notes for $3,735,000 at $83.00 per note. In sum, Peak realized $5,790,000 from its investment, yet asserts that but for defendants' errors, its notes would have been worth almost $700,000 more.

## B. **Procedural History**

Peak filed suit against U.S. Bank and Republic in the Superior Court of New Jersey, Mercer County, on February 8, 2002. Its complaint accused defendants of "negligence and negligent misrepresentation" under the common law of New Jersey.[2] (App. 22.) On April 18, 2002, defendants removed the case to the United States District Court for the District of New Jersey, grounding subject matter jurisdiction on diversity of citizenship.[3]

Following discovery, all parties moved for summary judgment. On March 24, 2005, the District Court granted defendants' motion. The Court found that U.S. Bank's error did not constitute an "event of default" as defined in the Indenture, and that U.S. Bank did not breach any pre-default duties it owed to Peak because the Indenture entitled it to rely on the information in Republic's Servicer Certificate. With respect to Republic, the Court found that Peak's claim was barred by its failure to comply with the Indenture's

---

[2] Peek also brought a claim for fraud, which was dismissed by the District Court.
[3] U.S. Bank's principal place of business is in Minnesota, Republic was chartered in Florida, and Peak's principal place of business is in New Jersey.

"no-action" clause.

## II. Jurisdiction & Standard of Review

Our review of the District Court's grant of summary judgment is plenary. *E.g.*, *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278 (3d Cir. 2000). That grant shall remain undisturbed only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). We will review the facts in a light most favorable to Peak, the party against whom summary judgment was entered. *See, e.g.*, *Coolspring Stone Supply, Inc. v. Am. States Life Ins. Co.*, 10 F.3d 144, 146 (3d Cir. 1993).

Typically in a diversity action we apply the law of the state in which the District Court sits. *See, e.g.*, *Berg Chilling Sys. v. Hull Corp.*, 435 F.3d 455, 462 (3d Cir. 2006). Here, however, the parties agree that, as specified in the Indenture and the SSA, New York law governs.

## III. Discussion

Peak claims that U.S. Bank and Republic negligently breached duties owed to Peak by their "collective failure to properly account for the financial condition of the trust." (Appellant's Br. 23.) We will address Peak's claims one defendant at a time.

### A. Claim Against U.S. Bank

It is hornbook law that a trustee owes a strict fiduciary duty of undivided loyalty to the beneficiaries of the trust. *See, e.g.*, *Matter of Heller*, 849 N.E.2d 649 (N.Y. 2006)

6

(citing Restatement (Second) of Trusts § 170(1)).  An Indenture Trustee, such as U.S.

Bank, however, is a different legal animal.  "Unlike the ordinary trustee, who has historic

common-law duties imposed beyond those in the trust agreement, an indenture trustee is

more like a stakeholder whose duties and obligations are exclusively defined by the terms

of the indenture agreement."  *Meckel v. Continental Resources Co.*, 758 F.2d 811, 816

(2d Cir. 1985) (citing *Hazzard v. Chase Nat'l Bank*, 287 N.Y.S. 541 (N.Y. Sup. Ct.

1936)).  New York common law imposes two duties on an Indenture Trustee in addition

to those specified in the Indenture: (1) a duty to avoid conflicts of interest with the

beneficiaries, *AMBAC Indem. Corp. v. Bankers Trust Co.*, 573 N.Y.S.2d 204, 207 (N.Y.

Sup. Ct. 1991), and (2) a duty to "perform basic non-discretionary ministerial tasks."

*Semi-Tech Litig., LLC v. Bankers Trust Co.*, 353 F. Supp. 2d 460, 472 (S.D.N.Y. 2005)

(citing *N.Y. State Med. Care Facilities Fin. Agency v. Bank of Tokyo Trust Co.*, 621

N.Y.S.2d 466, 468 (N.Y. Sup. Ct. 1994)).

It is only after an "event of default" occurs, as that term is defined in the Indenture,

that an Indenture Trustee's duty to noteholders becomes more like that of a traditional

trustee.  In that case, the Indenture Trustee must "use the same degree of care and skill in

[its] exercise as a prudent man would exercise or use under the circumstances in the

conduct of his own affairs" while exercising its rights and powers under the Indenture.[4]

---

[4] Indeed, the Indenture echoes this rule in section 6.1(a), where it states that "[i]f an Event of Default has occurred and is continuing, the Indenture Trustee shall exercise the rights and powers vested in it by this Indenture and use the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstances in the

*Beck v. Manufacturers Hanover Trust Co.*, 632 N.Y.S.2d 520, 527-28 (N.Y. App. Div. 1995) (quotations omitted). While not required to act outside of its rights and powers under the Indenture, the trustee still must, "as prudence dictates, exercise those singularly conferred prerogatives in order to secure the basic purpose of any trust indenture, the repayment of the underlying obligation." *Id*. at 528.

In light of the above, our first order of business must be to decide whether an event of default occurred under the terms of the Indenture in order to determine what legal duties, if any, U.S. Bank owed to Peak.

### 1. **Whether U.S. Bank Committed an "Event of Default"**

Section 5.1(b) of the Indenture states that an "event of default" occurs if U.S. Bank "default[s] in the payment of the principal of or any installment of the principal of any Note when the same becomes due and payable, and continuance of such default for a period of five (5) days, and default in payment of remaining Note Balance at the Final Maturity Date." (App. 205.)

Peak argues that U.S. Bank's pre-payments of principal to noteholders were events of default because those payments had yet to become "due and payable." Peak points out that section 3.1 of the Indenture states that the "indenture Trustee *shall*, . . . distribute all amounts . . . on each *Distribution Date*," which is designated as "the 25th day of each month." (App. 195, 245 (emphases added)). If the Indenture does not require U.S. Bank

_____

conduct of such person's own affairs." (App. 215.)

8

to pay principal only on the distribution date, Peak contends, it would lead to the absurd result that the Indenture Trustee would be "free to distribute principal at any rate and at any time" it so pleased.

The District Court disagreed, and held that no event of default occurred because the pre-payments "did not jeopardize future payments of principal." (App. 2154.) We agree. Perhaps U.S. Bank did, at least technically, violate section 3.1 of the Indenture by making principal pre-payments before the "Distribution Date." However, under the plain language of section 5.1(b),[5] an "event of default" only occurs if U.S. Bank cannot pay principal by the distribution date, and continues to fail to pay for five days thereafter.[6] The "event of default" can only occur if there is a "default"[7] on the date the payment is "due and payable." Thus, it cannot be, as Peak contends, that an event of default took place here upon the *early* payment of principal. Even if we were to assume that an early payment could later become a "default" once the "due and payable" date arrived, that default must continue for five days thereafter. Under Peak's proposed interpretation of "default," U.S. Bank would have been required to *take back* its early payments of

---

[5] In New York, a court interpreting a contract must look to the intentions of the parties for guidance. "If that intent is discernible from the plain meaning of the language of the contract, there is no need to look further. This may be so even if the contract is silent on the disputed issue." *Evans v. Famous Music Corp.*, 807 N.E.2d 869, 872 (N.Y. 2004).
[6] In addition, an "event of default" under section 5.1(b) requires a "default in payment of remaining Note Balance at the Final Maturity Date," which Peak does not allege.
[7] The Indenture's definition of the word "default" is unhelpful. It defines the term as "any occurrence that is . . . an Event of Default," and an "Event of Default" is only defined has having the "meaning specified in Section 5.1." (App. 1492-93.)

principal from the noteholders before the fifth day after the "due and payable" date to avoid committing an event of default. This surely cannot be what the parties to the Indenture intended.

Not only does Peak's interpretation contravene the plain meaning of section 5.1(b), but it also is at odds with the normal usage of the word "default." A "default" is defined as the "failure to perform a task or fulfill an obligation, especially failure to meet a financial obligation: *in default on a loan*." The American Heritage Dictionary of the English Language (4th ed. 2000). By paying principal early, U.S. Bank did not fail to fulfill its financial obligation under the Indenture. As the District Court pointed out, the events of default in an Indenture agreement are generally "designed to 'reflect a high probability that future payments of principal and interest will be jeopardized.'" (App. 2153-54 (quoting Efrat Lev, *The Indenture Trustee: Does it Really Protect Bondholders?*, 8 U. Miami Bus. L. Rev. 47, 102 (1999)). A "default is considered to be the primary concern of bondholders, *as their investment is at stake*." Lev, *supra* at 102 (emphasis added). Therefore, it is only the threat of losing this investment that triggers the Indenture Trustee's duty "as prudence dictates" to use its powers "in order to secure the basic purpose of any trust indenture, the repayment of the underlying obligation." *See Beck*, 632 N.Y.S.2d at 528.

In sum, U.S. Bank's early payment of principal to bondholders was not an "event of default" under section 5.1(b) of the Indenture and, thus, its only duties to Peak were those defined in the Indenture, together with those pre-default duties imposed by New

10

York common law: the performance of ministerial tasks, and the avoidance of conflicts of interest.

### 2. Whether U.S. Bank Owed a Pre-Default Duty to Peak

#### i. Contractual Duty

Peak alleges U.S. Bank breached two pre-default duties. The first, in an argument it makes for the first time on appeal, is a duty allegedly found in the Indenture.

Regardless of the occurrence of an event of default, under section 6.1(c) of the Indenture, U.S. Bank "may not be relieved from liability for its own negligent action, [or] its own negligent failure to act . . . except that . . . [it] shall not be liable for any error of judgment made in good faith . . . unless it is proved that [it] was negligent in ascertaining the pertinent facts." (App. 215.) Limiting this duty, however, is section 6.2(a), which grants U.S. Bank the right to "rely on any document believed by it to be genuine," without the need to "investigate any fact or matter stated in the document." [8] (App. 216.) Similarly, section 6.1(b)(ii) provides that U.S. Bank can in good faith

> conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon the certificates or opinions furnished to the Indenture Trustee and conforming to the requirements of this Indenture; however, the Indenture Trustee shall examine the certificates and opinions to determine whether or not they conform to the requirements of this Indenture.

---

[8] Under New York rules of contract interpretation, where a contract "employs contradictory language, specific provisions control over general provisions" and it "should be interpreted in a way which reconciles all its provisions if possible." *Green Harbour Homeowners' Ass'n v. G.H. Dev. & Constr., Inc.*, 789 N.Y.S.2d 319, 321 (N.Y. App. Div. 2005).

11

(App. 215.)

Peak contends that U.S. Bank had a duty under section 6.1(b)(ii) to "examine" the form of Republic's Servicer Certificate before relying on its erroneous information by comparing it to an example certificate attached as an exhibit to the SSA. Because that exhibit was never produced by U.S. Bank, and because U.S. Bank never demonstrated that it satisfied this alleged duty, Peak believes that summary judgment was inappropriate. Peak asserts that U.S. Bank's contractual right to rely on the Servicer Certificate was contingent on its "examin[ing]" the certificate, and absent that right, it was "negligent in ascertaining the pertinent facts," in violation of section 6.1(c).

Peak waived this argument by failing to raise it before the District Court. *See, e.g.*, *Gass v. Virgin Islands Tel. Corp.*, 311 F.3d 237, 246 (3d Cir. 2002) ("It is well established that failure to raise an issue in the district court constitutes a waiver of the argument."). Not only did Peak not argue before the District Court that U.S. Bank breached a duty grounded in section 6.1(b)(ii) of the Indenture, but it *conceded* at oral argument that "under the [Indenture] agreement, [U.S. Bank] could rely on the servicer certificate." (App. 2106.) Peak only contended, first, that under the Indenture, "U.S. Bank cannot be relieved from the liability for its own negligent action." (App. 2028.) Even if construed as a general duty not to be negligent, that duty is limited, as explained above, by U.S. Bank's right to "rely on any document believed by it to be genuine," which Peak conceded includes the Servicer Certificate. Second, in an argument we

12

address further below, Peak maintained that U.S. Bank had an implied duty to perform the allegedly ministerial task of independently verifying how much money was in the collection account.

As a result, it was uncontested before the District Court that U.S. Bank was not negligent in its reliance on Republic's Servicer Certificate.[9] Peak cannot now claim that summary judgment was in error because U.S. Bank failed to demonstrate that it "examine[d]" the Servicer Certificates, and failed to produce the example certificate attached to the SSA. The waiver rule "applies with added force where the timely raising of the issue would have permitted the parties to develop a factual record." *Gass*, 311 F.3d at 246. We will not penalize U.S. Bank for not offering evidence in anticipation of an argument not yet raised.

### ii. Common Law Duty

The second pre-default duty Peak alleges U.S. Bank owed, and breached, is one grounded in the common law. As stated earlier, New York law imposes two pre-default duties on an Indenture Trustee, only one of which is at issue in this case: a duty to "perform basic non-discretionary ministerial tasks." *See Semi-Tech Litig., LLC*, 353 F. Supp. 2d at 472 (citing *Bank of Tokyo Trust Co.*, 621 N.Y.S. at 468). Peak maintains that U.S. Bank violated this duty by "blindly bas[ing] its distribution calculation upon the

---

[9] Beyond that, U.S. Bank provided the testimony of numerous deponents to the effect that U.S. Bank was permitted to rely on the face of Republic's Servicer Certificate. Peak did not challenge this evidence before the District Court, nor does it now.

undefined 'net interest' figure reported by Republic" and by failing to reconcile that amount "and the amount that was actually available for distribution." (Appellant's Br. 48-49.)

In *Bank of Tokyo Trust*, the Supreme Court of New York found that a trustee could be held liable for "failing to perform its basic administrative obligations" if its Indenture exposed it to negligence claims, as U.S. Bank's Indenture here does. 621 N.Y.S. at 468. This implied duty, however, can be limited by the provisions of the Indenture. *See id.* In holding the trustee in that case liable for failing to notifying the plaintiff of an early bond redemption call, the Court explained that "the obligation to fulfill th[is] task[] is inherent in the very nature of an indenture trustee's service and, *absent a clear and unequivocal statement in the indenture . . . relieving the trustee of this duty*, . . . a trustee will be liable for negligence" for failing to fulfill that duty. *Id.* (emphasis added).[10]

The District Court found that reconciling the collection account balance was "not ministerial" because it "requires the Indenture Trustee to look beyond the numbers, and make numerous calculations." (App. 2158.) But the District Court need not have gone that far. As it correctly observed, "[i]n essence, Plaintiff is attempting to impose a duty on U.S. Bank that would nullify its right to rely on the Servicer Certificate." *Id.* Thus,

---

[10] The *Bank of Tokyo Trust* Court followed, in part, a Second Circuit case (applying New York law) that upheld the dismissal of a debenture holder's claim against its trustee for waiving a 50-day notice of redemption from the issuer. The Second Circuit stressed that the Indenture "specifically allow[ed] the trustee discretion to accept shorter notice." *Elliott Assocs. v. Schroder Bank & Trust Co.*, 838 F.2d 66, 70 (2d Cir. 1988).

14

wholly aside from whether this task is "ministerial" or "inherent in the very nature of an indenture trustee's service," the Indenture unequivocally "reliev[es] the trustee of this duty," *see Bank of Tokyo Trust Co.*, 621 N.Y.S. at 468, a point that Peak has conceded.

In sum, Peak has failed to demonstrate that U.S. Bank owed it a pre-default duty, much less that it breached such a duty. The District Court correctly granted U.S. Bank's motion for summary judgment.

## B. **Claim Against Republic**

Peak claims that Republic acted negligently when it entered the amount of gross interest collected into the line item for "Net Interest collected" on the Servicer Certificate, and that it admits as much. The District Court, however, never reached the merits of this argument because it held that Peak failed to comply with the Indenture's "no-action" clause.[11]

Section 5.6 provides that "[n]o Holder of any Note shall have the right to institute any Proceeding . . . with respect to this Indenture . . . , or for any other remedy hereunder, unless" it (a) gives "written notice to the Indenture Trustee of a continuing Event of Default," (b) 25 percent of the total noteholders request in writing that the Indenture Trustee "institute such proceeding . . . in its own name," (c) the noteholders agree to

---

[11] The District Court also held, and we agree, that Peak was not required to comply with the no-action clause with regard to its suit against U.S. Bank because it would have required "U.S. Bank, in effect, to sue itself." (App. 2151.) *See Cruden v. Bank of N.Y.*, 957 F.2d 961, 968 (2d Cir. 1992); *Feldbaum v. McCrory Corp.*, No. 12006, 1992 Del. Ch. LEXIS 113, at *23-*24 (Del. Ch. June 1, 1992) (applying New York law).

indemnify the Indenture Trustee for its costs, (d) the Indenture Trustee fails to institute a proceeding after 60 days of receiving notice, and (f) a majority of the noteholders do not request that the trustee not institute the proceeding. (App. 210-11.)

The main function of a no-action clause is to "delegat[e] the right to bring a suit enforcing the rights of bondholders to the trustee, or to the holders of a substantial amount of bonds." *Feldbaum v. McCrory Corp.*, No. 12006, 1992 Del. Ch. LEXIS 113, at *23-*24 (Del. Ch. June 1, 1992) (applying New York law). This function is a central feature of an Indenture, the primary purpose of which "is to centralize enforcement powers by vesting legal title to the securities in one trustee." *Id.* at *21 n.11.

It is undisputed that Peak, holder of only 1.4 percent of the outstanding amount of Keystone notes, did not satisfy the requirements of the no-action clause. Peak contends, however, that the clause does not apply here because it only alleges that Republic breached a duty grounded in the SSA and, thus, its suit is not "with respect to this Indenture" and does not seek any "remedy" under the terms of the Indenture. As it points out, Republic is not a party to the Indenture.

In *Feldbaum*, the plaintiff similarly argued that a no-action clause[12] did not apply to its common law fraud claim against companies affiliated with issuer because it did not seek to remedy the breach of an express indenture provision. 1992 Del. Ch. LEXIS 113, at *22. The Court rejected this argument and held, under New York law, that "no matter

---

[12] The no action clause in that case also contained the identical "with respect to this Indenture" language present here. *Feldbaum*, 1992 Del. Ch. LEXIS 113 at *17.

16

what legal theory a plaintiff advances, if the trustee is capable of satisfying its obligations, then any claim that can be enforced by the trustee on behalf of all bonds, . . . is subject to the terms of a no action clause of this type." *Id*. at \*22-\*23 (citing New York cases). While the primary purpose of a no-action clause may be to protect an *issuer* from the expense of defending frivolous lawsuits, "[c]ourts have implicitly concluded that [a no-action] clause applies equally to claims against non-issuer defendants." *Id*. at \*20, \*25 (citing *Levy v. Paramount Publix Corp.*, 266 N.Y.S. 271 (N.Y. Sup. Ct. 1933); *Relmar Holding Co. v. Paramount Publix Corp.*, 263 N.Y.S. 776 (N.Y. Sup. Ct. 1932)). Thus, individual bondholder suits should be dismissed "no matter whom the bondholders sue," as long as "the suits to be dismissed seek to enforce rights shared ratably by all bondholders."[13] *Id*. at \*26.

Here, as the District Court explained, if Republic's alleged negligence adversely affected the value of the notes, all bondholders were harmed, not only Peak. U.S. Bank, had it been asked by the bondholders in accordance with the no-action clause, could have asserted tort claims against Republic for erring in the Servicer Certificates. Thus, Peak's failure to comply with the no-action clause bars its claim against Republic. This result

_____

[13] Indeed, at least one commentator has said that the "scope of the no-action clause is rather broad," noting that it applies to "most noncontractual claims . . . and to suits against defendants other than the company." Marcel Kahan, *Rethinking Corporate Bonds: The Trade-Off Between Individual and Collective Rights*, 77 N.Y.U.L. Rev. 1040, 1051 (2002) (citing *McMahan & Co. v. Wherehouse Entm't, Inc.*, 859 F. Supp. 743, 746, 749 (S.D.N.Y. 1994) (holding no action clause bars claims against officers of issuer, underwriter of bonds, and issuer's parent company), *aff'd in part and rev'd in part*, 65 F.3d 1044 (2d Cir. 1995); *Feldbaum*, 1992 Del. Ch. LEXIS 113, at \*25).

does not render Republic's duties under the SSA "wholly illusory," as Peak claims; it only forces individual bondholders to channel their grievances through the Indenture Trustee in accord with the policy underlying the inclusion of no-action clauses in Indenture agreements. The District Court correctly granted summary judgment to Republic.

## IV. <u>Conclusion</u>

For the foregoing reasons, we will affirm the District Court's grant of summary judgment to defendants U.S. Bank and Republic.