897 A.2d 373 (2006)
385 N.J. Super. 324
Lawrence LEDERMAN, Plaintiff-Appellant, and
Philip Shapiro, Plaintiff/Intervenor-Appellant,
v.
PRUDENTIAL LIFE INSURANCE COMPANY OF AMERICA, INC., n/k/a/ Prudential Financial, Inc., Lenard Leeds, Steven A. Morelli, Jeffrey K. Brown, Deirdre J. Kamber, John Wirenius, Leeds & Morelli, L.L.P., Leeds, Morelli & Brown, P.C., James Vagnini, Bryan Mazzola, David Nevins, Lisa Calvacca, Susan Fitzgerald, Steve Friedman, Robert John Valli, Jr., Fredric David Ostrove, and Mark E. Faber, Defendants-Respondents, and
Diane Bradley and Brian D. Tusa, Defendants.[1]
Superior Court of New Jersey, Appellate Division.
Argued April 5, 2006.
Decided May 9, 2006.
*376 Stephen L. Snyder (Snyder, Slutkin and Snyder) of the Maryland bar, admitted pro hac vice, Baltimore, MD, argued the cause for appellants Lawrence Lederman and Philip Shapiro (Roper & Twardowsky, Totowa, William J. Skepnek (Skepnek Law Firm) of the Kansas bar, admitted pro hac vice, Lawrence, KS, Steven M. Smoot (Smoot Law Firm) of the Texas bar, admitted pro hac vice, Houston, TX, and Mr. Snyder, attorneys; Kenneth S. Thyne, Totowa, on the brief).
Janice DiGennaro (Rivkin Radler) of the New York bar, admitted pro hac vice, New York City, argued the cause for respondents Leeds, Morelli & Brown, P.C., Lenard Leeds, Steven A. Morelli, Jeffrey K. Brown and John Wirenius (Rivkin Radler, attorneys, Uniondale, NY; Ms. DiGennaro, Evan H. Krinick of the New York bar, admitted pro hac vice, New York City, Harris J. Zakarin, and Andrew S. Turkish, Uniondale, NY, on the brief).
Christopher J. Carey, Morristown, argued the cause for respondent Deirdre J. Kamber (Graham, Curtin & Sheridan, attorneys; Mr. Carey, of counsel; Mr. Carey, David M. Blackwell, and Joshua R. Elias, on the brief).
Theodore V. Wells, Jr. argued the cause for respondents Prudential Insurance Company of America, and Mark E. Faber (Paul, Weiss, Rifkind, Wharton & Garrison, and Lowenstein Sandler, attorneys; Gregory B. Reilly, Roseland, and Mr. Wells, on the brief).
Marshall D. Bilder, Trenton, argued the cause for respondents Lisa Calvacca, Susan Fitzgerald, Steven Friedman, Bryan Mazzola, David Nevins, Fredric David Ostrove, James Vagnini and Robert John Valli, Jr. (Sterns & Weinroth, attorneys; Mr. Bilder, of counsel; Mr. Bilder and Nancy Axilrod, on the brief).
Before Judges WEISSBARD, WINKELSTEIN and SAPP-PETERSON.
The opinion of the court was delivered by
WINKELSTEIN, J.A.D.
Plaintiff Lawrence Lederman appeals from the Law Division's summary judgment dismissing his claims against his former employer, Prudential Life Insurance Company of America (Prudential); Prudential's vice-president and general counsel, Mark E. Faber; his former attorneys, Leeds, Morelli & Brown, P.C. (LMB), a New York law firm; and multiple LMB attorneys. The court dismissed outright plaintiff's claims against a number of the individual defendants, while at the same time it dismissed and referred plaintiff's claims against Prudential and LMB and its principals to arbitration.
On appeal, Lederman challenges the dismissal of all claims.[2] We reverse the dismissal and reinstate the complaint as to the following defendants: Prudential and Faber; LMB and its named principals; and two of the individually named LMB attorneys, John Wirenius and Deirdre Kamber. We affirm the dismissal as to all remaining defendants.

I. The Facts and Procedural History
Lederman was employed by Prudential from 1966 through 1997 as a sales agent *377 and manager. He claims that in 1992, after he was transferred to Prudential's Bayonne office, Prudential pressured him not to sell insurance to minorities, and discriminated against him and other agents who did. He asserts that Prudential's actions caused him to suffer a mental breakdown, rendering him unable to continue his employment, which he left on disability in 1997.
Plaintiff was not the only Prudential employee who claimed to be aggrieved by Prudential's actions. Three hundred fifty eight current and former other Prudential employees also asserted that they had been subject to adverse employment actions by Prudential.
LMB is a law firm that represents clients who have claims against their employers. From March through May 1999, Lederman and the other employees with claims against Prudential attended a series of meetings at LMB's New York office. As a result of these meetings, Lederman and the others entered into retainer agreements with LMB, authorizing LMB to receive a one-third contingent fee to represent them in their employment claims against Prudential.
Lederman and the other aggrieved employees then entered into an agreement dated May 5, 1999, (the May 1999 Agreement or the Agreement) with both Prudential and LMB. The Agreement, governed by New York law, obligated Lederman and the other "Covered Claimants" to engage in a confidential alternative dispute resolution (ADR) process to resolve their employment claims against Prudential.
Under the Agreement's terms, a Covered Claimant was required to submit all claims that he or she may have against Prudential to the process enunciated in the Agreement, known as "Roads to Resolution" (R to R), including claims of discrimination, tortious interference with contractual relations, fraud, misrepresentation, and intentional and negligent infliction of emotional distress. If that process was unsuccessful, the Covered Claimant would submit to binding arbitration. The Agreement further provided that despite the one-third contingent fee agreement signed by each Covered Claimant with LMB, Prudential would pay each Claimant's attorneys' fees to LMB. The Agreement stated in part:
So as to relieve each of the Covered Claimants of the obligation he or she has undertaken by signing a retainer agreement with [LMB] to pay [LMB's] attorneys' fees in the amount of 33 1/3% of the Covered Claimant's recovery, if any, Prudential agrees to pay attorneys' fees to [LMB] on behalf of the Covered Claimants, in exchange for which [LMB] agrees to release and discharge each and every Covered Claimant from any obligation to pay attorneys' fees to [LMB] for its representation of the Covered Claimant in [the R to R process] any provision of any retainer agreement between [LMB] and a Covered Claimant to the contrary notwithstanding.
In addition, the May 1999 Agreement contained confidentiality provisions. It stated:
(a) Covered Claimants and [LMB] shall not disclose, cause or suffer to be disclosed, either directly or indirectly... (i) this Agreement, its execution, negotiation, existence, or terms; (ii) any Claim or the underlying facts thereof; (iii) their employment, or separation from employment, by Prudential; or (iv) the terms of any award or negotiated settlement hereunder.
(b) Covered Claimants and [LMB] shall not disclose to any person or entity, except as required by law, ... any facts, testimony, or documents obtained from, submitted by, or revealed by any *378 party hereunder, any information concerning the settlement terms or relief (if any) obtained hereunder, or any information about the amounts of fees and costs paid pursuant to this Agreement.
The parties agreed that any court action to enforce the Agreement would be filed under seal.
Of particular import to Prudential and LMB was the Agreement's arbitration provision. In paragraph 20, the parties agreed that (1) any dispute about the terms or the application of the Agreement would be resolved by the American Arbitration Association (AAA), and (2) no party or arbitrator could disclose the existence, content, or results of any arbitration without Prudential's prior written consent.
Despite the language in the Agreement that purported to make it "the entire agreement and final understanding concerning the subject matter," also on May 5, 1999, Prudential and LMB, but not the Covered Claimants, entered into a separate agreement (the Second May 1999 Agreement). That agreement obligated LMB to submit Lederman's claim, and the claims of the other 358 claimants, to Prudential's confidential R to R process; according to plaintiff's complaint, in return, Prudential was obligated to pay $15,000,000 as follows: the first $5,000,000 was to be paid to LMB as counsel fees in advance of the resolution of any claims; the remaining $10,000,000 was to be distributed to the claimants through the R to R process. The agreement contained a schedule of proposed payments from Prudential to LMB:
(i) Upon execution hereof, Prudential will advance the sum of Three Million Five Hundred Thousand Dollars ($3,500,000) to [LMB] against Earned Fees which both Prudential and [LMB] reasonably anticipate [LMB] will earn under the Agreement (the "Initial Advance");
(ii) Upon completion of the resolution of the first one hundred (100) Claims, but in no event later than August 31, 1999, Prudential will advance the sum of Five Hundred Thousand Dollars ($500,000) to [LMB] against Earned Fees which both Prudential and [LMB] reasonably anticipate [LMB] will earn under the Agreement ("the Second Advance") and Prudential will simultaneously advance the sum of One Million Dollars ($1,000,000) to [LMB] against Earned Fees which both Prudential and [LMB] reasonably anticipate [LMB] will earn under the Agreement (the "Third Advance"); and
(iii) After payment by Prudential of the Initial Advance and the Second and Third Advance and upon resolution of not less than one hundred (100) Claims, [LMB] may from time to time but not more frequently than quarterly seek further advances against Earned Fees then reasonably anticipated to be earned by [LMB] under the [ADR] Agreement ("Additional Advances")....
Prudential further agreed that "in no event shall [LMB] be required to return the Initial Advance or the Second Advance or any portion thereof."
Plaintiff claims he was never told of the $5,000,000 counsel fee payment, $4,000,000 of which he claims is non-refundable, before he signed the May 1999 Agreement. He alleges the $5,000,000 payment by Prudential to LMB was a commercial bribe; that it is evidence of a conspiracy between LMB and Prudential to defraud and deceive him and the other signatories; and that defendants conspired to deprive him of LMB's zealous representation in his action against Prudential. Defendants dispute the allegations.
*379 Meanwhile, another Covered Claimant, Philip Shapiro, filed a complaint in January 2001 with the Grievance Committee of the New York State Supreme Court, alleging ethical violations against LMB and its attorneys based on the counsel fee arrangement reflected in the second May 1999 Agreement. In response to those allegations, Lederman claims that at defendant Jeffrey Brown's request he wrote a series of letters to the Grievance Committee, which said, in essence, that he was aware of and had consented to the $5,000,000 advance from Prudential to LMB. Lederman later claimed that LMB forced him to write those letters. He certified that Brown told him that a failure to write the letters would prevent his dispute with Prudential from being resolved.
The Grievance Committee dismissed the complaint against LMB. It ruled that "there was no breach of the Code of Professional Responsibility" on the part of LMB.
By May 2001, few of the signatories to the May 1999 Agreement had settled their claims against Prudential. On May 22, 2001, Lederman and the remaining Covered Claimants attended a meeting with LMB, where they signed an amendment to the May 1999 Agreement, with corresponding separate retainer agreements and confidentiality provisions. That amendment proposed mediation in front of a neutral third-party mediator.
Because by July 2001 175 claims remained against Prudential, including Lederman's, Prudential offered a global settlement for the remaining unresolved claims. At a meeting held by LMB to explain the global settlement, Lederman and the other Covered Claimants agreed to pay LMB five percent of their "total award for expenses incurred by this process."[3]
On October 17, 2001, Lederman and the remaining claimants signed a settlement agreement (the Global Agreement), which again amended the May 1999 Agreement. According to the Global Agreement, Prudential would pay $10,500,000 in the aggregate to settle all of the remaining claims, LMB agreed to "receive no further fees of any kind whatsoever," and each Covered Claimant agreed to sign a general release and to keep confidential any information about the process or the settlement. Adjudicators would decide the allocations among the Claimants. Subsequently, the adjudicators allocated $500,000 to Lederman for his dispute against Prudential, which was "the second highest allocation among all Covered Claimants." Lederman received that amount less five percent for LMB's "expenses." He then executed a settlement agreement and general release. This document incorporated the terms of the May 1999 Agreement as modified by the subsequent agreements, and it included a confidentiality provision.
When on November 8, 2002, Lederman filed his complaint, he did not file it under seal; a violation of the confidentiality provisions of the various agreements he had signed.[4] He also affixed the May 1999 *380 Agreement to the complaint. That, too, violated the confidentiality provisions of the May 1999 Agreement and its amendments. Consequently, on defendants' motion, the court placed the pleadings and accompanying documents under seal, and closed the proceedings to the public.
Several months later, Prudential, LMB and the LMB attorneys moved to dismiss Lederman's second amended complaint or to compel arbitration of those claims. Lederman cross-moved for discovery. The parties filed supporting certifications. In a sealed hearing on September 8, 2004, the motion judge (1) dismissed Lederman's second amended complaint against Prudential and LMB, and against Leeds, Morelli and Brown individually, and then referred those claims to arbitration; and (2) dismissed Lederman's second amended complaint against some, but not all, of the other LMB attorneys. The court did not address Lederman's cross-motion for discovery. The judge memorialized the decision by order of October 8, 2004, which also permanently sealed the record. Following a subsequent sealed hearing, the motion judge dismissed plaintiff's claims against the remaining individual defendants.

II. Standard of Review
Defendants moved to dismiss plaintiff's complaint pursuant to Rule 4:6-2(e). The motion judge converted the motion to a summary judgment motion and considered the parties' certifications. See Pressler, Current N.J. Court Rules, comment 4.1.2 on R. 4:6-2(e) (2006) (when materials outside of pleadings are relied on by judge, motion treated as one for summary judgment). In resolving a summary judgment motion, both the trial court and appellate court must view the facts in the light most favorable to the party opposing the motion, and, if the competent evidential materials, when viewed in that light, present material issues of disputed fact, summary judgment must be denied. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995); Prudential Prop. & Cas. Ins. Co. v. Boylan, 307 N.J.Super. 162, 167, 704 A.2d 597 (App.Div.), certif. denied, 154 N.J. 608, 713 A.2d 499 (1998).

III. Discussion
We turn first to the motion judge's decision to dismiss plaintiff's claims against Prudential and LMB and its principals and refer those claims to arbitration. An issue before the Law Division was whether the May 1999 Agreement and subsequent agreements were procured by fraud. During oral argument before this court, plaintiff acknowledged that if his claims against Prudential and LMB are arbitrable, it is the arbitrator, not the judge, who decides if the agreements were procured by fraud. See Buckeye Check Cashing, Inc. v. Cardegna, ___ U.S. ___, ___, 126 S.Ct. 1204, 1210, 163 L.Ed.2d 1038, 1046 (2006); Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 403-04, 87 S.Ct. 1801, 1806, 18 L.Ed.2d 1270, 1277 (1967); Van Syoc v. Walter, 259 N.J.Super. 337, 338-39, 613 A.2d 490 (App. Div.1992), certif. denied, 133 N.J. 430, 627 A.2d 1136 (1993). Consequently, the threshold question we must address is whether plaintiff's claims as expressed in this lawsuit are arbitrable.[5] That is, *381 whether plaintiff's asserted claims fall within the scope of the arbitration clause of the May 1999 Agreement and its amendments. The motion judge found the scope of the arbitration clause encompassed plaintiff's claims. We disagree.
The arbitration provision of the May 1999 Agreement is subject to the Federal Arbitration Act (FAA), 9 U.S.C.A. §§ 1-16. Arbitration pursuant to that statute is favored. Martindale, supra, 173 N.J. at 84, 800 A.2d 872. "`Congress declared a national policy favoring arbitration and withdrew the power of the states to require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration.'" Ibid. (quoting Southland Corp. v. Keating, 465 U.S. 1, 10, 104 S.Ct. 852, 858, 79 L.Ed.2d 1, 12 (1984)). "The substantive protection of the FAA applies irrespective of whether arbitrability is raised in federal or state court." Ibid.
An arbitration clause subject to the FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 218, 105 S.Ct. 1238, 1241, 84 L.Ed.2d 158, 163 (1985). Unless an arbitration provision itself is a product of fraud, an election to arbitrate should be enforced. Van Syoc, supra, 259 N.J.Super. at 339, 613 A.2d 490; Yale Materials Handling Corp. v. White Storage & Retrieval Sys., Inc., 240 N.J.Super. 370, 376, 573 A.2d 484 (App.Div.1990) (ambiguities in agreements subject to the FAA are to be resolved in favor of arbitration); Rio Algom, Inc. v. Sammi Steel Co., Ltd., 168 A.D.2d 250, 562 N.Y.S.2d 486, 488 (1990) (New York state policy favors and encourages arbitration), appeal denied by, 78 N.Y.2d 853, 573 N.Y.S.2d 466, 577 N.E.2d 1058 (1991).
To determine the issues the parties agreed to arbitrate, the court applies the federal substantive law of arbitrability to the arbitration agreement within coverage of the FAA. Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 626, 105 S.Ct. 3346, 3353, 87 L.Ed.2d 444, 454-55 (1985). Doubts as to the scope of issues to be arbitrated are to be resolved in favor of arbitration. Id. at 626, 105 S.Ct. at 3353-54, 87 L.Ed.2d at 455. The federal policy of favoring arbitration agreements "is at bottom a policy guaranteeing the enforcement of private contractual arrangements: the [FAA] simply creates a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate." Id. at 625, 105 S.Ct. at 3353, 87 L.Ed.2d at 454 (internal quotation omitted). Put simply, "as with any other contract, the parties' intentions control, but those intentions are generously construed as to issues of arbitrability." Id. at 626, 105 S.Ct. at 3354, 87 L.Ed.2d at 455. See also First Options of Chicago, supra, 514 U.S. at 944, 115 S.Ct. at 1924, 131 L.Ed.2d at 993 (to determine if the parties have agreed to arbitrate a specific issue, a court applies "ordinary state-law principles that govern the formation of contracts"); Quigley v. KPMG Peat Marwick, LLP, 330 N.J.Super. 252, 271, 749 A.2d 405 (App.Div.) (only issues to be arbitrated are those the parties have agreed are to be arbitrated), certif. denied, 165 N.J. 527, 760 A.2d 781 (2000).
*382 "In interpreting a contract provision, the polestar . . . is the intention of the parties to the contract as revealed by the language used, taken as an entirety; and, in the quest for the intention, the situation of the parties, the attendant circumstances, and the objects they were thereby striving to attain are necessarily to be regarded." Biovail Corp. Int'l v. Hoechst Aktiengesellschaft, 49 F.Supp.2d 750, 774 (D.N.J.1999) (internal quotations omitted); see also Evans v. Famous Music Corp., 1 N.Y.3d 452, 775 N.Y.S.2d 757, 807 N.E.2d 869, 872 (2004) (court's role in interpreting contract is to ascertain parties' intent). While the search does not require an inquiry into the subjective intent of the parties, it does center on "the intent embodied by the language that the parties chose to memorialize their agreement." Biovail Corp. Int'l, supra, (quoting Williams v. Metzler, 132 F.3d 937, 947 (3d Cir.1997)); see also Lopez v. Fernandito's Antique, Ltd., 305 A.D.2d 218, 760 N.Y.S.2d 140, 141 (2003) (determine intent from language employed). "[C]ourts should interpret a contract considering `the objective intent manifested in the language of the contract in light of the circumstances surrounding the transaction.'" Biovail Corp. Int'l, supra (quoting Smith-Kline Beecham Corp. v. Rohm & Haas Co., 89 F.3d 154, 159 (3d Cir.1996)); see also In re Riconda, 90 N.Y.2d 733, 665 N.Y.S.2d 392, 688 N.E.2d 248, 253 (1997) ("parties' intent derived from the whole document and set of . . . particularized circumstances").
Applying these principles, we conclude that plaintiff's claims in his second amended complaint against Prudential and LMB and its attorneys do not fall within the scope of the arbitration agreement.
Plaintiff's retainer agreement with LMB provided that LMB would represent him with respect to his "labor action" against Prudential. In the event of a settlement or monetary award, LMB would receive one-third of the settlement figure or award. After signing that agreement, plaintiff and the other Covered Claimants entered into the May 1999 Agreement with Prudential and LMB. In that agreement, Prudential agreed to pay the Covered Claimants' counsel fees for their claims against Prudential. It provided, in part:
WHEREAS, [LMB] deems it to be in the best interests of the Covered Claimants for them to enter into an agreement with Prudential whereby and whereunder the Covered Claimants, upon [LMB]'s advice, make a binding election exclusively to utilize R to R . . . to resolve any disputes a Covered Claimant has or might hereafter prior to his or her final resolution hereunder have with Prudential in exchange for Prudential's agreement to provide for the Covered Claimants to be represented by [LMB] during each and every stage of the process hereunder and Prudential's further agreement to pay the Covered Claimants' attorneys' fees due to [LMB] . . . for which, absent such agreement, the Covered Claimants would be responsible by virtue of the terms of the retainer agreement which each of them has signed with [LMB]. . . .
In return for Prudential's agreement to pay their counsel fees to LMB, the Covered Claimants agreed to forego a lawsuit; and to have their claims resolved through Prudential's ADR process.
2. Each Covered Claimant, acting through [LMB] as his or her agent and Attorney-in-Fact,[[6]] hereby agrees to *383 forego and not to commence or to join any action at law or in equity or arbitration or other form of litigation or alternative dispute resolution and instead to submit hereunder any and all claims and causes of action, including any actions, suits, controversies, claims, complaints and demands whatsoever, whether in law or equity, which he or she may have or hereafter prior to his or her final resolution hereunder acquire against Prudential arising out of, or concerning or related to each Covered Claimant's employment or separation from employment with Prudential including, but not limited to any claims for salary, bonuses, severance pay, vacation pay or any benefits under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"); sexual harassment, or discrimination based upon race, color, national origin, ancestry, religion, marital status, sex, sexual orientation, citizenship status, pregnancy, medical condition or disability under Title VII of the Civil Rights Act of 1964, the Civil Rights Acts of 1866, 1871 and 1991, the Americans With Disabilities Act, Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. §§ 1981, 1983, the Vocational Rehabilitation Act of 1973, the Family Medical Leave Act, the Fair Labor Standards Act, and any other federal, state, or local law prohibiting discrimination in employment; age discrimination under the Age Discrimination in Employment Act, as amended by the Older Workers Benefit Protection Act, or any other federal, state, or local law prohibiting age discrimination; or any claim of tortious conduct, . . . or any other employment-related tort . . . . (emphasis added).
The Agreement was to be kept confidential. Disputes were to be resolved by arbitration.
20. Any dispute about the terms or application hereof, but not as to a Claim, shall be resolved by arbitration in New York City administered by the American Arbitration Association ("AAA") in accordance with its Commercial Arbitration Rules as in effect at the time such dispute arises and from time to time thereafter, except that the dispute shall be decided by three (3) arbitrators, who shall be selected as follows: within ten (10) days of the service of a demand for arbitration, Prudential shall designate one arbitrator, [LMB] shall designate one arbitrator, and the arbitrators so designated shall, within ten (10) days of the second such appointment, designate a third neutral arbitrator. In the event that they are unable to do so, the parties or their attorneys may request the AAA to appoint the third neutral arbitrator. . . . Except as may be required by law, no party nor any arbitrator may disclose the existence, content or results of any arbitration hereunder without Prudential's prior written consent. (emphasis added).
The language of the arbitration clause, in the context of the Agreement as a whole, does not encompass a dispute between plaintiff and his attorneys, or plaintiff's claim that LMB and Prudential conspired to defraud him. We arrive at this conclusion for the following reasons.
The purpose of the May 1999 Agreement is to resolve disputes plaintiff has arising out of his employment with Prudential. In exchange for waiving his right to file a lawsuit to seek redress for those claims, plaintiff agreed to an ADR process to resolve "any and all claims and causes of action" plaintiff had against Prudential "arising out of, or concerning or related to [plaintiff's] employment or separation from employment with Prudential." Plaintiff could pursue those claims and have his *384 attorneys' fees paid by Prudential, so long as he agreed to the R to R process contained in the Agreement. Simply put, the Agreement's purpose is to resolve plaintiff's claims against Prudential for actions taken against him by Prudential while he was in its employ. The Agreement's purpose is not to resolve claims that arose out of a conspiracy between Prudential and LMB to limit plaintiff's ability to seek redress for his employment-related claims.
The arbitration clause in paragraph 20 of the Agreement provides a separate dispute resolution process to be applied for "any dispute about the terms or application hereof." That arbitration process calls for a referral of those disputes to the American Arbitration Association, to be decided by three arbitrators; one selected by Prudential, one selected by LMB, and a neutral third arbitrator to be selected by those two. This selection clause contemplates arbitration between Prudential on the one hand and plaintiff and his representative, LMB, on the other. It does not provide a mechanism for selecting an arbitrator to resolve claims between plaintiff and his attorneys.
The language of the arbitration clause of the May 1999 Agreement speaks in terms of "any dispute about the terms or application" of the Agreement. It does not use the broader terminology: "arising out of, concerning or related to" the Agreement, which language would be more supportive of defendants' position. See RCM Techns., Inc. v. Constr. Servs. Assocs., Inc., 149 F.Supp.2d 109, 112 n. 2, 113 (D.N.J.2001) (comparing broad arbitration clause which contained "arising out of or relating to . . . Agreement" with more narrow arbitration clause); Quigley, supra, 330 N.J.Super. at 273-74, 749 A.2d 405 (trial court erred in ordering arbitration because of narrow language contained in arbitration clause; "[p]laintiff did not agree to arbitrate `any dispute' between plaintiff and defendant arising out of `termination' of employment").
Here, in fact, the Agreement does contain the broader "arising out of, or concerning or related to" language, but it does so in paragraph 2, where it describes in exquisite detail the types of claims a Covered Claimant is required to bring against Prudential through the R to R process. That same broad language is not used in the arbitration clause in paragraph 20, the section of the May 1999 Agreement that is at issue here. The parties did not agree to arbitrate all issues "arising out of, or concerning or related to" the Agreement. Rather, they only agreed to arbitrate "any dispute about the terms or application" of the Agreement.
The allegations in plaintiff's complaint do not concern the terms or application of the Agreement. The claims are directed to what plaintiff characterizes as the "corrupt bargain" that took place before he and the other Covered Claimants signed the May 1999 Agreement; a "bargain" in which his attorneys agreed to receive a nonrefundable multi-million dollar payment from Prudential without plaintiff's knowledge, raising the question of who the attorneys were actually representing: plaintiff, Prudential or themselves. It is not the meaning of the terms of the May 1999 Agreement that is the subject of plaintiff's complaint, nor is there a dispute over how the R to R process works or is to be applied. Plaintiff claims his own attorneys and Prudential conspired to defraud him and deprive him of his attorney's unfettered loyalty. That the Agreement may be evidence of that conspiracy does not involve a dispute about the "terms or application" of the Agreement. No objective reading of the language of the May 1999 Agreement brings these *385 types of claims within paragraph 20's arbitration provision.
We are mindful of arbitration's favored status. "That favored status, however, is not without limits." Garfinkel v. Morristown Obstetrics & Gynecology Assocs., P.A., 168 N.J. 124, 132, 773 A.2d 665 (2001). "[A]rbitration is simply a matter of contract between the parties; it is a way to resolve those disputes  but only those disputes  that the parties have agreed to submit to arbitration." First Options of Chicago, Inc., supra, 514 U.S. at 943, 115 S.Ct. at 1924, 131 L.Ed.2d at 992. Here, we do not find the arbitration clause to be ambiguous. Placed in context, the arbitration provision of the May 1999 Agreement does not encompass plaintiff's claims against Prudential and LMB as expressed in plaintiff's second amended complaint.
The motion judge, in arriving at his decision that plaintiff's claims were required to be arbitrated, concluded that the arbitrators selection language of the May 1999 Agreement could be reformed to allow plaintiff to select an arbitrator in his own right. As support for the position that the arbitration clause may be reformed, defendants cite to Morris v. N.Y. Football Giants, Inc., 150 Misc.2d 271, 575 N.Y.S.2d 1013 (1991), and Erving v. Virginia Squires Basketball Club, a Ltd. P'ship, 468 F.2d 1064 (2d Cir.1972). We do not consider these decisions to be on point.
The cited cases simply involve the substitution of an arbitrator for the arbitrator named in the arbitration agreements because the court found the named arbitrator to have a potential bias. Neither case stands for the proposition that an arbitration clause may be reformed so as to change the procedure to designate an arbitrator.
"Reformation presupposes that a valid contract between the parties was created but, for some reason, was not properly reflected in the instrument that memorializes the agreement." H. Prang Trucking Co., Inc. v. Local Union No. 469, 613 F.2d 1235, 1239 (3d Cir.1980). Reformation is not intended to modify a contract, but recognizes that the scrivener failed to adequately reduce the parties' intentions to writing. Aarvig v. Aarvig, 248 N.J.Super. 181, 186, 590 A.2d 704 (Ch. Div.1991). "[W]here reformation is premised upon mistake in the preparation of the agreement, there must be clear and convincing proof that the contract in its reformed, and not original, form is the one that the contracting parties understood and meant it to be. . . ." Capanear v. Salzano, 222 N.J.Super. 403, 407-08, 537 A.2d 306 (App.Div.1988) (internal quotations omitted); see also George Backer Mgmt. Corp. v. Acme Quilting Co. Inc., 46 N.Y.2d 211, 413 N.Y.S.2d 135, 385 N.E.2d 1062, 1066 (1978) (reformation not granted to alleviate oppressive bargain, but "to restate the intended terms of an agreement when the writing that memorializes that agreement is at variance with the intent of both parties").
Here, defendants have submitted no evidence to show that the Agreement, as it was written, did not reflect the intent of the parties as to the process to be used to appoint the arbitrators. They do not even make that claim. They simply assert that the Agreement can be changed to give plaintiff an opportunity to choose his own arbitrator so his interests can be separated from the interests of LMB. That is not grounds for reformation. Indeed, we view the necessity of changing the arbitration clause to allow plaintiff to appoint his own arbitrator  which parenthetically would leave LMB without the right to select an arbitrator  as evidence that the parties did not anticipate that the arbitration clause would cover actions by plaintiff against his attorneys in the first instance.
*386 Consequently, we reverse the Law Division order dismissing plaintiff's complaint against Prudential and LMB and its principals and sending those claims to arbitration. The claims are reinstated and the substantive issues are to be resolved by the factfinder, not an arbitrator.
In that regard, defendants raised a number of substantive arguments as to why plaintiff's complaint should be dismissed, among them the defenses of waiver and judicial estoppel. Those are issues for the Law Division to address after plaintiff is given an opportunity to conduct discovery. The judge never decided plaintiff's cross-motion for discovery. Plaintiff claims he signed the agreements without full disclosure, and only wrote the letters to the New York State Grievance Committee at the insistence of his attorney. In other words, plaintiff essentially claims he was coerced or fraudulently induced into signing the agreements and writing the letters. This creates a factual dispute that requires resolution by trial or plenary hearing, as appropriate, after the parties have had an opportunity for discovery. See Conforti v. Guliadis, 128 N.J. 318, 322-23, 328-29, 608 A.2d 225 (1992) (material facts in conflicting affidavits warrant plenary hearing), aff'g, 245 N.J.Super. 561, 586 A.2d 318 (App.Div.1991); Bruno v. Gale, Wentworth & Dillon Realty, 371 N.J.Super. 69, 76-77, 852 A.2d 198 (App. Div.2004) (reversing and remanding for plenary hearing to resolve conflicting factual contentions in certifications); Klier v. Sordoni Skanska Constr. Co., 337 N.J.Super. 76, 85-86, 766 A.2d 761 (App.Div.2001) (where there are conflicting certifications, a plenary hearing should be conducted). These issues cannot be resolved on a motion to dismiss with certifications.
Next, we address plaintiff's claims against the individual attorney defendants. Plaintiff named as defendants LMB, its named partners, Lenard Leeds, Steven Morelli, and Jeffrey Brown, and a dozen other lawyers who worked for [LMB], three of whom were non-equity shareholders, and nine associates. The three named shareholders were Fredric Ostrove, James Vagnini, and Robert Valli. The named associates were John Wirenius, Dierdre Kamber, Bryan Mazzola, David Nevins, Lisa Calvacca, Susan Fitzgerald, Steven Friedman, Diane Bradley and Brian Tusa.
In the Law Division, plaintiff dismissed the claims against defendants Tusa and Bradley. At oral argument before this court, plaintiff agreed to dismiss its appeal as to the following individual defendants: Calvacca, Fitzgerald, Friedman, Mazzola and Nevins.
Of the remaining individual defendants, we take first the partners, Ostrove, Vagnini and Valli. Ostrove began working for LMB in 1996, while Vagnini and Valli began in 1997. All three became non-equity shareholders in 2000. At oral argument before this court, plaintiff's sole reason for maintaining his appeal of the dismissal of these individual defendants was on the theory of vicarious liability. Plaintiff's arguments are not persuasive.
Each of the three has certified that he provided no legal services to plaintiff, did not participate in the negotiation or execution of any of the agreements identified in plaintiff's complaint, and never supervised any attorney or employee of LMB with respect to matters involving plaintiff. LMB is a professional corporation. Under both New York and New Jersey law, a shareholder of a professional corporation is only liable for his own negligent or wrongful misconduct or the conduct of an employee he supervises. See, inter alia, N.J.S.A. 14A:17-8; N.Y. Bus. Corp. Law § 1505(a); Somer & Wand, P.C. v. Rotondi, 219 A.D.2d 340, 642 N.Y.S.2d 937, 938-39 (1996), appeal dismissed by, 251 A.D.2d *387 567, 674 N.Y.S.2d 770 (1998). Thus, because Ostrove, Vagnini and Valli did not render professional services for plaintiff or supervise any LMB employees who did, they are not personally liable. Consequently, we affirm the trial judge's dismissal of plaintiff's complaint as to those individuals.
The remaining two associates of the LMB firm who were dismissed by the trial judge are John Wirenius and Deirdre Kamber. We conclude that sufficient factual allegations were raised against both Wirenius and Kamber that, in the absence of providing plaintiff an opportunity for further discovery, should have defeated these particular defendants' motions to dismiss.[7]
In Lederman's certification in opposition to defendants' motion to dismiss, he alleged that Wirenius advised him he would do better in the global settlement than with a separate arbitration process. According to Lederman, Wirenius told him "he could not see me getting less than a million dollars in [a] global settlement." Plaintiff alleges these actions create a factual dispute as to Wirenius's participation in the alleged conspiracy.
Kamber was an associate with LMB from September 1998 until her employment with [LMB] terminated in April 2002. She certified that she did not participate in any of the activities that comprised the basis of plaintiff's second amended complaint; in other words, she was not involved in the creation, drafting or execution of the May 1999 Agreement or any additional agreements to which plaintiff was a party. Her participation was "essentially limited to the day-to-day maintenance of the file, in which capacity [she] engaged in, among other things, organizing and reviewing documents, research, writing and client contact."
That said, plaintiff has certified that Kamber assured him that he did not need to worry about his claim being time-barred. This, claims plaintiff, was apparently done in an effort to keep him from questioning the validity of the May 1999 Agreement. Also, in May 2000, Kamber, with plaintiff's assistance, prepared a summary of his damages in the amount of over $5,000,000. In subsequent conversations, plaintiff claims Kamber portrayed an attorney for another plaintiff who made allegations that LMB was acting inappropriately, as "a maniac who did not know what he was talking about and who was engaging in unprofessional and illegal conduct," which would subsequently harm plaintiff's ability to obtain a recovery against Prudential. Kamber, by letter and by personal conduct, allegedly informed plaintiff that payments her firm received were contingent based upon plaintiff's recovery, but she failed to disclose the nonrefundable payment paid by Prudential to LMB. Plaintiff submits that all of these actions were taken in furtherance of the conspiracy between Prudential and LMB to defraud him.
We recognize that plaintiff's pleadings did not contain sufficient statements of fact to support the substantive allegations against Wirenius and Kamber. Simply making nonparticularized allegations against the individuals does not satisfy New Jersey's pleading requirements. See generally, R. 4:5-2 (pleading requires statement of facts upon which claim is based); R. 4:5-8(a) (fraud pleading requires particulars); Ziegelheim v. Apollo, 128 N.J. 250, 267, 607 A.2d 1298 (1992) (attorney malpractice claims must contain *388 particular facts rather than generalized assertions); Glass v. Suburban Restoration Co., Inc., 317 N.J.Super. 574, 581-83, 722 A.2d 944 (App.Div.1998) (rejecting malpractice claim in the absence of specific allegation; vague, nonparticularized allegations insufficient). Nevertheless, a complaint should not be dismissed pursuant to Rule 4:6-2(e) so long as a cause of action is suggested by the facts. See Printing Mart-Morristown v. Sharp Electronics Corp., 116 N.J. 739, 746, 563 A.2d 31 (1989). The appropriate remedy is to permit an amendment of the complaint. Ibid. Given Kamber's and Wirenius's personal involvement with plaintiff, and the absence of an opportunity for plaintiff to engage in discovery, we conclude that plaintiff presented sufficient facts to defeat the dismissal motion as to both.
That leaves defendant Mark Faber, Prudential's vice-president and corporate counsel. Plaintiff's complaint alleges that Faber was directly involved in the negotiations between Prudential and LMB. Absent discovery, it was error to dismiss the complaint as to Faber.

IV. Summary
In sum, we reverse the Law Division order that dismissed plaintiff's complaint against Prudential; LMB and its named principals, Leeds, Morelli and Brown; Faber; Wirenius; and Kamber. We affirm the dismissal as to all remaining defendants. We remand for further proceedings consistent with this opinion. We do not retain jurisdiction.
Affirmed in part, reversed in part and remanded.
NOTES
[1] We have edited the caption to reflect the correct spellings and status of the parties.
[2] Lederman and intervenor plaintiff Philip Shapiro also challenge Law Division orders that sealed all pleadings in this case and barred public access to court proceedings. We reversed those sealing orders in a companion appeal also filed this date, taken by intervenors American Broadcasting Companies, Inc., North Jersey Media Group, Inc., and Bloomberg News LP. See Lederman v. Prudential Life Ins. Co. of Am., 385 N.J.Super. 307, 897 A.2d 362 (App.Div.2006).
[3] The record is unclear whether the five percent for expenses was in addition to the $5,000,000 to be paid to LMB under the terms of the second May 1999 Agreement.
[4] Lederman subsequently filed an amended and second amended complaint that alleged: (1) breach of fiduciary duty by LMB and the LMB attorneys (count one); (2) fraud and misrepresentations by Prudential, LMB, and the LMB attorneys, for "inducing Plaintiff to agree to the resolution of his claims for less than their true value" (count two); (3) negligence and legal malpractice by LMB and the LMB attorneys because they "neglected and mismanaged Plaintiff's case" and conspired with Prudential and Faber (count three); (4) breach of contract by LMB and the LMB attorneys when they agreed with Prudential "not to file lawsuits" (count four); (5) tortious interference by Prudential for bribing LMB (count five); (6) infliction of emotional distress by all defendants (count six); and (7) negligent supervision by LMB of its attorneys (count seven).
[5] When, like here, the arbitration agreement itself does not indicate that the arbitrator decides arbitrability, it is the court that determines which matters the parties agreed to arbitrate. First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 943-44, 115 S.Ct. 1920, 1924, 131 L.Ed.2d 985, 992-93 (1995); Martindale v. Sandvik, Inc., 173 N.J. 76, 92-93, 800 A.2d 872 (2002); Nationwide Gen. Ins. Co. v. Investors Ins. Co., 37 N.Y.2d 91, 371 N.Y.S.2d 463, 332 N.E.2d 333, 335 (1975) (it is for the courts, not the arbitrator, to make the initial determination as to whether the dispute is arbitrable).
[6] Plaintiff claims that neither he nor the other Covered Claimants designated LMB as their attorney-in-fact. That is not an issue we need to address in this opinion.
[7] We do not address the parties' jurisdictional or damages/proximate cause arguments in this opinion. These issues must abide an opportunity for plaintiff to obtain discovery.