**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3385-23

INVEL CAPITAL, LLC,

     Plaintiff-Respondent,

v.

45 WILLIAM URBAN RENEWAL
LLC, a/k/a 45 WILLIAM STREET
URBAN RENEWAL, LLC,

     Defendant-Appellant,

and

GUTMAN WEISS, PC,

     Defendant.

_____

        Argued March 18, 2025 – Decided July 7, 2025

        Before Judges Sumners and Bergman.

        On appeal from the Superior Court of New Jersey, Law
        Division, Essex County, Docket No. L-4297-22.

        Dov B. Medinets (Gutman Weiss, PC) argued the cause
        for appellant.

Richard W. Mackiewicz, Jr., argued for respondent (Mackiewicz Law, LLC, attorneys; Richard W. Mackiewicz, Jr., on the brief).

PER CURIAM

This appeal requires us to determine whether the buyer of a commercial/residential building (property) can terminate a purchase and sales agreement (agreement) due to the buyer's pre-closing receipt of an unacceptable estoppel certificate by one of the property's commercial tenants, citing to the seller's default of the tenant's lease agreement and changes to the lease agreement. The trial court entered judgment that the buyer properly exercised its right to terminate the agreement upon receipt of the unacceptable estoppel certificate. We affirm.

I

45 William Urban Renewal LLC (45 William) is the owner of the Newark property. In November 2021, 45 William agreed to sell the property to Invel Capital LLC for $32,800,000. Per the parties' agreement, Invel deposited $1,640,000 as a down payment with a third-party escrow agent. The January 14, 2022 closing date was subsequently changed to February 15, 2022 and then postponed to an unspecified date. The agreement did not contain a "time is of the essence" clause to close. The closing date was delayed because of 45

2

William's dispute with the City of Newark regarding the implementation of their PILOT[1] agreement. Ultimately, in June 2022, the situation was resolved, and the parties worked towards closing on the sale of the property.

On June 27, in anticipation of closing, 45 William provided Invel Capital with an unacceptable estoppel certificate dated June 9 by TLE at Newark, LLC, a commercial tenant operating a school on the property, in accordance with the agreement's Article 13 Covenants of Seller, section 13.10(a). The estoppel certificate, issued at 45 William's request, stated that 45 William defaulted on its lease agreement with Invel Capital by not providing drop-off and pick-up areas.[2] The estoppel certificate also made Invel Capital aware that TLE—which paid 17.65% of the property's rental income—sued 45 William for breaching their lease agreement that resulted in a settled lawsuit. The resolution significantly modified the value of the lease agreement because: (1) the original lease term from 2019 to 2034, with extensions to 2044, changed to 2022 to 2037,

---

[1] PILOT is an acronym for Payment In Lieu Of Taxes. See Mack-Cali Realty Corp. v. State, 466 N.J. Super. 402, 422 (App. Div. 2021), aff'd o.b., 250 N.J. 550 (2022).

[2] The estoppel certificate also stated: "Except to the extent arising from the Landlord defaults set forth in Section 6 above, Tenant has no claim against Landlord and no offset or defense to enforcement of any of the terms of the Lease." (Da324.)

A-3385-23

and if extended, to 2047; (2) the lease term was increased by 20% on the fifteen-year term and 12% on the twenty-five-year term, where escalations were limited to one 12% increase for years six, eleven, and if extended, for years sixteen and twenty-one; and (3) instead of rent being set for the years 2019-2044, it now ran from 2022-2047.

On July 1, Invel Capital informed 45 William that it was terminating their agreement because "[45 William's] failure to deliver an [a]cceptable [e]stoppel [c]ertificate pursuant to Section 13.10(a) of the [a]greement, [and Invel Capital] is thereby entitled to terminate this [a]greement and receive the [d]own [p]ayment." Invel Capital pointed out the estoppel certificate disclosed 45 William's lease default, a lawsuit settlement agreement, and amendments to TLE's lease, which breached 45 William's representation in section 8.1(1)(ii) of the agreement that information 45 William provided regarding the property's leases was materially accurate and had not been modified. 45 William rejected the termination demand and refused to release Invel Capital's deposit.

On July 25, Invel Capital sued 45 William claiming breach of contract and sought specific performance to compel release of its deposit. About two weeks later, TLE submitted to 45 William an acceptable estoppel certificate without any alleged defaults, which 45 William promptly sent to Invel Capital.

4

Notwithstanding, Invel Capital continued to seek relief through its lawsuit and refused to buy the property.

Following discovery, Invel Capital moved for partial summary judgment to compel return of its deposit.[3] Applying the summary judgment standard under Rule 4:46-2(c) and Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520 (1995), the trial court determined there was no genuine dispute of material fact and, viewing the facts in the light most favorable to the non-movant 45 William, Invel Capital was entitled to judgment compelling 45 William to return its down payment.

In its statement of reasons, the court explained its ruling was based on its interpretation of the agreement's section 13.10(a), which set forth the estoppel certificate requirement. Section 13.10(a) states:

> Seller shall, within ten (10) days after the date of this Agreement, prepare and submit to any commercial tenant under the Leases an estoppel certificate, in the form attached to or contemplated under each such Lease, if any, or if no form was previously contemplated, in substantially the form attached hereto as Schedule H ("Estoppel Certificate"). Seller shall use commercially reasonable efforts to obtain an Estoppel

---

[3] In addition, the court ordered: (1) Invel Capital can amend its complaint to allege fraud in the inducement against 45 William; (2) defense counsel cannot be added as a party; and (3) an extended discovery schedule. These rulings were not appealed.

Certificate from the commercial tenant prior to the Closing. Upon receipt of the executed Estoppel Certificate, Seller shall promptly furnish a copy thereof to Purchaser. Subject to the provisions hereof, Purchaser's obligation to close title hereunder is conditioned upon any commercial tenant under the Leases (the "Required Tenant") delivering to Purchaser an estoppel certificate which conforms in all material respects to the form attached to or contemplated under each such Lease, if any, or if no form was previously contemplated, the estoppel certificate set forth in Schedule H (an "Acceptable Estoppel Certificate").

[¶] The failure of Seller to obtain an Acceptable Estoppel Certificate from the Required Tenant shall not be deemed a default by Seller, it being agreed that the sole remedy of Purchaser in the event Seller does not obtain an Acceptable Estoppel Certificate from the Required Tenant shall be to terminate this Agreement and receive a refund of the Down Payment. An estoppel certificate received from a Required Tenant shall not be an Acceptable Estoppel Certificate if such Required Tenant discloses a default on the part of landlord or tenant under its Lease or discloses another Material Matter (as hereinafter defined). As used herein, a "Material Matter" shall mean a default or other matter relating to a Lease which, in each case, would subject the landlord thereunder to any liability, or otherwise adversely affect the rent, additional rent or other revenue that Purchaser will receive under a Lease after the Closing Date or contain a discrepancy with the information shown on the Rent Roll.

Finding section 13.10(a) wording was plain and unambiguous, the court held 45 William breached the agreement because it did not provide Invel Capital with an "Acceptable Estoppel Certificate" from TLE confirming no default or

"Material Matter" affecting TLE's lease with 45 William. <u>See</u> <u>Lederman v.</u> <u>Prudential Life Ins. Co. of Am., Inc.</u>, 385 N.J. Super. 324, 339 (App. Div. 2006) (citing <u>Biovail Corp. Int'l v. Hoechst Aktiengesellschaft</u>, 49 F. Supp. 2d 750, 774 (D.N.J. 1999)) (holding contract parties intend to have the contract's plain meaning enforced). The court stressed that TLE's certificate made Invel Capital aware for the first time of: (1) prior amendments to TLE's lease agreement with 45 William; (2) a settlement agreement which resolved prior undisclosed litigation; and (3) 45 William's default by not providing dedicated drop-off/pick-up areas for TLE's school. Because of these disclosures, the court reasoned Invel had the "unfettered right to terminate" the agreement under section 13.10(a) as the estoppel certificate was unacceptable.

The court rejected 45 William's argument that it could cure an unacceptable estoppel certificate by delivering a later, acceptable certificate prior to closing. It reasoned that if the parties intended to permit 45 William to cure an unacceptable certificate—or give it until the closing date to supply an acceptable certificate—then: "(i) they would not have provided for a prompt delivery of whatever certificate as the tenant provides the text of the agreement actually establishes; and (ii) they could have and surely would have provided explicitly for a right of cure." Given the finding that there was no cure provision,

the court explained that to allow 45 William to cure its estoppel certificate would require amending the agreement to grant it a right not otherwise conferred.

The court further found that to allow 45 William to deliver an acceptable estoppel certificate on the closing date—despite previously submitting a defective certificate—is illogical. The court reasoned, "[t]hat would require [Invel Capital]—in a state of obvious uncertainty—to continue to prepare for such [c]losing . . . on the possibility [45 William] would be able to effect a cure and deliver an [a]cceptable [e]stoppel [c]ertificate on the [closing] day." That would effectively undermine the requirement that 45 William must promptly provide Invel Capital an acceptable estoppel certificate.

The court determined section 13.10(a) allowed Invel Capital to terminate the agreement upon receipt of an unacceptable estoppel certificate. Even though "[45 William] delivered the critical [e]stoppel [c]ertificate very late in the process, on the eve of the (re-scheduled) closing," the court maintained it "does not nullify the right the parties contemplated [that Invel Capital] would have in the event of a non-compliant [e]stoppel [c]ertificate at any time."

The court rejected 45 William's assertion that changes in Invel's financial positioning[4] were relevant to bar Invel Capital from exercising its "explicitly conferred" right to terminate. Indeed, it noted that Invel Capital's pretextual reasoning to terminate did not violate the implied covenant of good faith and fair dealing because it was legitimately protecting its own interests in exercising a right afforded to it. There is no allegation that Invel Capital had an improper motive or purpose to harm 45 William. The court found that Invel was within its right to terminate—the only right it could exercise if 45 William's certificate was unacceptable, which it was.

The court emphasized that 45 William was not without recourse. For instance, 45 William could have resolved any deficiencies with TLE to avoid the issuance of an unacceptable estoppel certificate. The court held that 45 William requests "an unfair advantage of taking a chance on securing a cured certificate by the time of [c]losing, knowing that if it does not do so, it only risked having to return the [d]own [p]ayment." The court reiterated that the

---

[4] About a month or so after suit was filed, Invel Capital's broker emailed 45 William stating that Invel Capital's withdrawal was solely related to "the rise in interest rates, [as] Invel [Capital]'s lender reduced the amount of proceeds they would lend on the property. This made it very challenging for Invel [Capital] to raise the necessary equity to close."

agreement's language does not support the right to cure an unacceptable estoppel certificate at closing.

Although Invel Capital's breach of contract claim remained, the judgment directing specific performance—return of the deposit—was certified as final under Rule 4:42-2(a). Thus, 45 William appealed the judgment.

II

Based upon our de novo review, DeSimone v. Springpoint Senior Living, Inc., 256 N.J. 172, 180 (2024), we conclude there is no genuine issue as to any material fact and as a matter of law Invel Capital was correctly granted judgment requiring return of its deposit to purchase the property.

We acknowledge the "purpose of an estoppel certificate is to give assurance that the party making the estoppel statement at a later date will not make claims that are inconsistent with the statements contained in the estoppel [certificate]." Urban Sites of Chi. LLC v. Crown Castle USA, 979 NE.2d 480, 490 (Ill. App. Ct. 2012) (alterations in original) (internal quotations and citation omitted). Thus, an estoppel certificate sets forth the current status and terms of the lease agreement between the tenant and the landlord for a prospective purchaser of property.

45 William argues the "purpose [of TLE's estoppel certificate] is not to give Invel [Capital] a pretext for terminating the [agreement] based on newly discovered adverse information, but to protect Invel [Capital] from future claims." We disagree. There is no dispute that section 13.10(a) of the agreement requires that 45 William provide Invel Capital with an acceptable estoppel certificate confirming no default or material matter affecting a property tenant's lease and, if an unacceptable certificate is provided, Invel Capital can terminate the agreement and have its deposit returned. Invel Capital promptly terminated the agreement after it received TLE's unacceptable estoppel certificate and demanded its deposit.

We reject 45 William's contention that the agreement does not grant Invel Capital the right to terminate solely based on receiving an unacceptable estoppel certificate and it has the right to cure by providing an acceptable estoppel certificate prior to closing. Section 13.10(a) plainly states that Invel Capital must "close title" if a commercial tenant delivers an estoppel certificate but "the sole remedy of [Invel Capital] in the event [45 William] does not obtain an [a]cceptable [e]stoppel [c]ertificate . . . will be to terminate this Agreement." This provision does not, as 45 William asserts, mean that termination is permitted only when 45 Williams did not supply an acceptable estoppel

A-3385-23

certificate at closing. Without a "right to cure" provision, 45 William's unacceptable estoppel certificate could not be remedied absent Invel Capital's approval. There is no provision in the agreement stating or even suggesting that 45 William has the right to submit more than one estoppel certificate. The agreement states, "[u]pon receipt of the executed Estoppel Certificate, [45 William] shall promptly furnish a copy thereof to [Invel Capital]." (Emphasis added). Nothing in section 13.10(a) nor any other provision in the agreement speaks to an acceptable estoppel certificate being a condition precedent to closing.

Section 13.10(a)'s lack of a cure clause for an unacceptable estoppel certificate is in contrast with Article 8 Representations and Warranties of Seller. Section 8.2 states "in the event of any material breach . . . discovered prior to the Closing Date, which is not fully cured or corrected prior to the Closing Date, [Invel Capital's] sole remedy under this Agreement with respect thereto shall be to terminate the Agreement prior to the Closing Date . . . ." (Emphasis added). The absence of a similar clause in section 13.10 supports Invel Capital's position that there is no clause in the agreement providing that 45 William can thwart Invel Capital from terminating the agreement by curing an unacceptable estoppel certificate at closing.

As for Invel Capital's purported desire not to buy the property due to financial reasons, its motive is irrelevant given that 45 William did not allege a breach of the implied covenants. Moreover, the trial court correctly recognized that Invel Capital legitimately exercised its contractual rights to terminate the agreement upon receipt of an unacceptable estoppel certificate.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division

A-3385-23