■ JAMES V. AQUAVELLA, M.D., P.C., et al., Appellants, v RALPH S. VIOLA, M.D., Respondent. [914 NYS2d 498]—

Appeal from an order of the Supreme Court, Monroe County (Kenneth R. Fisher, J.), entered August 24, 2009 in a breach of contract action. The order granted the motion of defendant to set aside the jury verdict and dismissed the amended complaint.

It is hereby ordered that the order so appealed from is affirmed without costs.

Memorandum: Plaintiffs commenced this action seeking damages for defendant's breach of a 1998 oral employment agreement (1998 oral agreement) pursuant to which defendant was to be an employee of plaintiff James V. Aquavella, M.D., P.C. (Aquavella, P.C.). According to plaintiffs, the 1998 oral agreement incorporated all of the terms and conditions of a 1996 written employment agreement (1996 written agreement) between defendant and Urban Oncology Service, P.C., doing business as Eye Care of Genesee Valley (Urban Oncology). The 1996 written agreement contained, inter alia, a noncompete clause prohibiting defendant from competing with Urban Oncology's business for two years after the expiration of the 1996 written agreement or termination of defendant's employment, whichever occurred later.

In 1995, plaintiff James V. Aquavella, M.D. (Aquavella) sold the assets of his ophthalmology practice to EquiVision, Inc. (EquiVision), which then entered into a services agreement with Urban Oncology. Aquavella then became an employee of Urban Oncology. Pursuant to the services agreement, Urban Oncology would provide professional medical patient services, including hiring and contracting with physicians, and EquiVision would serve as business manager for the practice. Ultimately, EquiVision, then known as EquiMed, sold its interest in

the assets of the practice to Physicians Resource Group, Inc. (PRG). In 1998, following a dispute with Aquavella, PRG terminated all nonmedical employees and Urban Oncology stopped paying the physicians. In 1998, Aquavella spoke with defendant, and the parties agreed that defendant would continue his employment at the practice with plaintiffs as his employers. However, the parties sharply dispute whether their 1998 oral agreement included all of the terms and conditions of the 1996 written agreement between defendant and Urban Oncology, inclusive of the two-year noncompete clause.

In 1999, plaintiffs executed an agreement with PRG that, inter alia, provided for plaintiffs' purchase of the assets of the practice. In August 1999, the parties undertook negotiations concerning defendant's proposed purchase of the practice. Those negotiations were not successful and, in 2002, defendant departed from plaintiffs' practice and opened a competing practice within 300 yards of his former employers.

Plaintiffs' amended complaint alleged that defendant breached the noncompete clause in the 1996 written agreement that, according to plaintiffs, had been incorporated in its entirety as a term and condition of the 1998 oral agreement. Following trial, the jury determined that Aquavella and defendant entered into an oral employment agreement that included all of the terms and conditions of defendant's 1996 written agreement with Urban Oncology. The jury further determined that defendant had breached the noncompete clause and awarded plaintiffs damages in the sum of $248,798.76. Supreme Court granted defendant's motion pursuant to CPLR 4404 (a) for judgment notwithstanding the verdict and dismissed plaintiffs' amended complaint on the grounds that defendant had not made any admission that the terms and conditions of the 1996 written agreement were incorporated into the 1998 oral agreement and that the writings proffered by plaintiff, either alone or in combination, were insufficient to satisfy the statute of frauds (see General Obligations Law § 5-701 [a] [1]). We affirm.

Inasmuch as the noncompete clause plaintiffs seek to enforce spanned a period of two years, it cannot be performed within one year and thus is subject to the statute of frauds (see id.). The record belies plaintiffs' contention that defendant admitted through his pleadings and trial testimony that the terms and conditions of the 1996 written agreement were incorporated into the 1998 oral agreement and, indeed, the record establishes that defendant sharply disputed it throughout the litigation (see Tallini v Business Air, 148 AD2d 828, 829-830 [1989]; see also Williams v Lynch, 245 AD2d 715 [1997], appeal dismissed 91

NY2d 957 [1998]). We reject plaintiffs' further contention that various writings admitted in evidence, including some that were signed by defendant, satisfy the statute of frauds. "[T]he 'memorandum [necessary to satisfy the statute of frauds] . . . may be pieced together out of separate writings, connected with one another either expressly or by the internal evidence of subject matter and occasion' " (*Crabtree v Elizabeth Arden Sales Corp.*, 305 NY 48, 54 [1953], quoting *Marks v Cowdin*, 226 NY 138, 145 [1919]) and, in the event "that . . . one of the writings is unsigned, [it] may be 'read together [with the signed writings], provided that they clearly refer to the same subject matter or transaction' " (*Scheck v Francis*, 26 NY2d 466, 471 [1970], quoting *Crabtree*, 305 NY at 55). All of the terms of the contract, however, "must be set out in the various writings presented to the court, and at least one writing, the one establishing a contractual relationship between the parties, must bear the signature of the party to be charged, while the unsigned document[s] must . . . refer to the same transaction as that set forth in the one that was signed" (*Crabtree*, 305 NY at 55-56).

Here, plaintiffs contend that the parties' 1998 oral agreement incorporated all of the terms and conditions of defendant's 1996 written agreement with his former employer, Urban Oncology. That essential term does not appear in any of the writings, leaving a fatal void in plaintiffs' attempt to piece together a sufficient memorandum through the presentation of various signed and unsigned documents (*see id.* at 55). Plaintiffs further contend that the letters of intent signed by defendant in 1999 with respect to his proposed purchase of the practice constitute evidence of defendant's agreement to incorporate all of the terms and conditions of the 1996 written agreement into the 1998 oral agreement. We reject that contention. Pursuant to paragraph 4 (e) of the letters of intent, one of the conditions to closing the transaction was "(e) a written termination of the employment contract between [defendant] and Aquavella[, P.C.], together with a release of all covenants contained therein, and . . . proof satisfactory to [defendant] that Aquavella[, P.C.] is the sole unencumbered assignee of said contract (named party is Urban Oncology Services, P.C. [doing business as] 'Eye Care of the Genesee Valley')." The 1996 written agreement required that any mutual termination thereof be in writing. We conclude that paragraph 4 (e) is an unequivocal attempt by defendant, as part of the due diligence process in the practice purchase transaction, to extinguish any lingering obligations or covenants arising from the "said contract," i.e., the 1996 written agreement. A fair reading of defendant's trial testimony compels the same conclusion. The request for "proof satisfactory" to defendant

that Aquavella, P.C. was the sole "assignee" of that contract demonstrates that defendant was requiring Aquavella, P.C. to establish that it was the successor by assignment to defendant's 1996 written agreement with Urban Oncology and therefore had the right to terminate the noncompete clause contained in that agreement. It is noteworthy that, when plaintiffs commenced this action in 2002, the complaint did not contain any claim that the parties had adopted or incorporated the 1996 written agreement into the 1998 oral agreement. Instead, plaintiffs' complaint was based entirely upon the claim that Aquavella, P.C. was the sole assignee of the 1996 written agreement. In 2007, this Court modified a prior order in this case, affirming that part of the order that, inter alia, denied that part of plaintiffs' motion for partial summary judgment on the claims arising from the 1996 written agreement on the ground that "plaintiffs failed to establish as a matter of law that the [1996] agreement was validly assigned and was in effect when defendant opened his own practice" (*James V. Aquavella, M.D., P.C. v Viola* [appeal No. 2], 39 AD3d 1191, 1192). In 2009, three days before trial, plaintiffs amended the complaint to advance the claim for the first time that the parties had incorporated the 1996 written agreement into the 1998 oral agreement. On the second day of trial, plaintiffs abandoned their original claim when Aquavella acknowledged that no such assignment had occurred.

Further, paragraph 4 (e) in each letter of intent makes no reference, express or implied, to the 1998 oral agreement. Plaintiffs' contention to the contrary is belied by the separate language contained in paragraph 4 (f) of each letter of intent, which requires "(f) written releases executed by [defendant] and Aquavella each releasing the other from any claims relating to the *current employment* of [defendant]" (emphasis added). Paragraph 4 (f) thereby separately addresses the 1998 oral agreement under which the parties were operating in 1999 and, when read together, paragraphs 4 (e) and (f) demonstrate that defendant did not agree to incorporate all of the terms and conditions of the 1996 written agreement into the 1998 oral agreement. The draft asset purchase agreement, upon which plaintiffs also rely, contains identical language and is likewise insufficient.

We note that our dissenting colleagues have failed to explain the specific use in paragraph 4 (f) of the term "*current employment*" (emphasis added), as distinguished from past employment, i.e., the employment set forth in the 1996 written agreement with Urban Oncology specifically described in paragraph 4

(e). If, as the dissent suggests, paragraph 4 (e) referred to the 1998 oral agreement inclusive of the 1996 written agreement, there would be no need to use the distinguishing term "current employment" in paragraph 4 (f). Further, if paragraph 4 (e) was, as the dissent suggests, referring to the 1998 oral agreement, any reference to the alleged assignment of the 1996 written agreement to Aquavella, P.C. would be irrelevant and superfluous. Under plaintiffs' incorporation theory, the 1998 oral agreement simply incorporated the terms and conditions of the 1996 written agreement into a new agreement. That theory does not depend in any manner upon assignment of the 1996 written agreement to Aquavella, P.C. Thus, the reference to Aquavella, P.C. as the "sole unencumbered assignee of said contract" in paragraph 4 (e) is inconsistent with the interpretation of that clause advanced by plaintiffs and the dissent. The dissent offers no explanation—and, in particular, no explanation consistent with plaintiffs' theory—why proof relating to the assignment to Aquavella, P.C. of "said contract" was specifically included in the language used in paragraph 4 (e). That approach disregards the well-settled rule that a contract must be "read as a whole to determine its purpose and intent" (*W.W.W. Assoc. v Giancontieri*, 77 NY2d 157, 162 [1990]), and it "should be interpreted in a way [that] reconciles all its provisions, if possible" (*Green Harbour Homeowners' Assn., Inc. v G.H. Dev. & Constr., Inc.*, 14 AD3d 963, 965 [2005]; *see Beal Sav. Bank v Sommer*, 8 NY3d 318, 324 [2007]). "Effect and meaning must be given to every term of the contract . . . , and reasonable effort must be made to harmonize all of its terms" (*Village of Hamburg v American Ref-Fuel Co. of Niagara*, 284 AD2d 85, 89 [2001], *lv denied* 97 NY2d 603 [2001]; *see Matter of El-Roh Realty Corp.*, 74 AD3d 1796, 1799 [2010]; *see generally Hartford Acc. & Indem. Co. v Wesolowski*, 33 NY2d 169, 171-172 [1973]). When all of the provisions of the letters of intent are read as a whole, it is clear that paragraph 4 (e) addresses defendant's desire to terminate any remaining rights and obligations under the 1996 written agreement with Urban Oncology and paragraph 4 (f) separately addresses the extinguishment of any rights and obligations arising from the 1998 oral agreement. As the litigation has progressed, it has become clear that defendant's concern—clearly expressed in paragraph 4 (e)—about the possibility of lingering claims arising out of the 1996 written agreement with Urban Oncology was well founded. Plaintiffs commenced this action on the sole theory that Aquavella, P.C. was the assignee of the 1996 written agreement. The record demonstrates that, when it became clear that Aquavella, P.C. was not an assignee of that agreement and that plaintiffs

therefore had no standing to assert any rights thereunder, the complaint was amended three days before trial to add the theory that the 1996 written agreement was incorporated into the 1998 oral agreement.

The dissent concludes that "the parties orally adopted the 1996 written agreement as the memorandum of the terms of their 1998 oral agreement, and we may therefore look to the 1996 written agreement to supply all of the essential terms of the 1998 oral agreement." While the 1996 written agreement contains many terms and conditions that were no doubt essential to the parties at the time that agreement was made, there is one term that is essential to plaintiffs' version of the 1998 oral agreement that is not and could not be contained in the 1996 written agreement—the oral incorporation of the 1996 written agreement that allegedly took place in 1998. The dissent's analysis fails to recognize that the only evidence of the alleged 1998 oral adoption of the 1996 written agreement—clearly an essential term of the 1998 oral agreement under plaintiffs' theory—is Aquavella's testimony at trial. The dissent's reliance upon parol evidence to fill that gap in the writings is misplaced (*see Henry L. Fox Co. v Kaufman Org.*, 74 NY2d 136, 143 [1989]). "Parol evidence is admissible only to connect the papers, not to establish missing terms of the agreement" (*id.* at 142-143).

We cannot accept the dissent's conclusion that the written agreement executed in 1996 could include an essential term of the oral agreement that was not made until 1998. There simply is no writing, signed or unsigned by defendant, that contains any language reflecting any incorporation of the 1996 written agreement into the parties' 1998 oral agreement. "It is not sufficient that the note or memorandum may express the terms of a contract. It is essential that it shall completely evidence the contract [that] the parties made" (*Poel v Brunswick-Balke-Collender Co. of N.Y.*, 216 NY 310, 314 [1915], *rearg denied* 216 NY 771 [1916]). The writings are insufficient because, in order to satisfy the statute of frauds, " 'the memorandum must state the essential terms of the *oral contract*' " (*Nathan v Spector*, 281 App Div 451, 455 [1953] [emphasis added]). While defendant has never disputed that he had an oral employment agreement with plaintiffs, he has steadfastly denied that the 1996 written agreement was adopted by the parties in the 1998 oral agreement. Thus, the dissent's reliance upon the recovery of compensation by defendant under the 1998 oral agreement provides no basis to conclude that he agreed to the adoption of the 1996 written agreement into the 1998 oral agreement (*see Williams*, 245 AD2d 715 [1997]; *Tallini*, 148 AD2d at 829-830).

Inasmuch as the only evidence supporting plaintiffs' contention that all of the terms and conditions of the 1996 written agreement were incorporated into the 1998 oral agreement is Aquavella's testimony at trial, we conclude that plaintiffs' version of the 1998 oral agreement is unenforceable and void under the statute of frauds (*see generally Shirley Polykoff Adv. v Houbigant, Inc.*, 43 NY2d 921, 922 [1978]).

All concur except Scudder, P.J., and Peradotto, J., who dissent and vote to reverse in accordance with the following memorandum.

Scudder, P.J., and Peradotto, J. (dissenting). We respectfully dissent because we agree with plaintiffs that the signed and unsigned writings admitted in evidence at trial are sufficient to satisfy the statute of frauds (*see* General Obligations Law § 5-701 [a] [1]).

Plaintiff James V. Aquavella, M.D. is an ophthalmologist who established a medical practice (practice) in Rochester in the 1980s. He is also the sole shareholder and director of plaintiff James V. Aquavella, M.D., P.C. (Aquavella, P.C.). In the mid-1990s, Aquavella sold the assets of the practice to EquiMed, formerly known as EquiVision, a practice management company, although he continued to manage the practice. EquiMed thereafter established Urban Oncology Services, P.C., doing business as Eye Care of Genesee Valley (Urban Oncology), to pay the practice's physicians and maintain their employment contracts.

Defendant began working at the practice as a fellow under Aquavella's supervision in July 1995. In July 1996 defendant was hired by the practice as a staff ophthalmologist and executed an "M.D. Employment Agreement" with Urban Oncology (1996 written agreement). The 1996 written agreement contained a restrictive covenant prohibiting defendant from competing with the practice within a 50-mile radius for a period of two years following his termination of employment or the expiration of the agreement, whichever occurred later, as well as a liquidated damages provision in the event of defendant's breach of the agreement.

Shortly after defendant entered into the 1996 written agreement, EquiMed sold the assets of the practice to Physicians Resource Group, Inc. (PRG). In October 1998, following a dispute with Aquavella, PRG terminated the practice's nonmedical staff, and Urban Oncology ceased paying its physicians. Soon thereafter, Aquavella and defendant agreed that defendant would continue working at the practice as an employee of Aquavella, P.C., although the parties dispute the terms of that oral agreement (1998 oral agreement). According to Aquavella,

the parties "reaffirmed" or "adopted" all of the terms and conditions of the 1996 written agreement, including the restrictive covenant and the liquidated damages provision. Defendant acknowledged that he orally agreed to continue working for the practice in exchange for certain compensation and benefits, but he denied that the parties discussed the 1996 written agreement or reaffirmed the terms thereof. The parties subsequently entered into formal negotiations for the possible sale of the practice to defendant. After those negotiations were unsuccessful, defendant left the practice and opened a competing practice across the street from the office of Aquavella, P.C.

Plaintiffs commenced this action seeking damages for defendant's alleged breach of the restrictive covenant contained in the 1996 written agreement. Plaintiffs alleged that, pursuant to their 1998 oral agreement, the parties adopted the terms and conditions set forth in the 1996 written agreement, including the restrictive covenant. Defendant asserted, inter alia, a counterclaim seeking $20,000 in compensation for medical services allegedly provided to plaintiffs pursuant to the 1998 oral agreement.

At trial, Aquavella testified that, within 24 hours of PRG's termination of all nonmedical employees, he "reaffirmed" the terms of the 1996 written agreement with defendant. Aquavella stated that the parties "adopted the exist[ing] contract and . . . continued to function under it." From that point forward, Aquavella, P.C. paid the salaries of defendant and the other physicians in accordance with their agreements with Urban Oncology. Aquavella further testified that, during the parties' negotiations concerning the possible sale of the practice, he and defendant discussed the fact that "the existing agreement [i.e., the 1996 written agreement], would have to be terminated." According to Aquavella, he and defendant "both recognized that the [1996 written agreement] was in effect. In order for [Aquavella] to sell [defendant] the practice, that had to be terminated."

By contrast, defendant testified at trial that, following what he believed was PRG's termination of his employment, he and Aquavella "struck up an oral agreement for [defendant] to continue working [at the practice]." Defendant agreed to continue working at the productivity compensation rate of 30% of his gross patient cash revenues, as set forth in the 1996 written agreement. Defendant testified, however, that Aquavella did not mention the 1996 written agreement, which defendant thought was "dead," and the parties did not discuss any postemployment restrictions. Defendant specifically denied hav-

ing a conversation with Aquavella wherein they "reaffirmed" the 1996 written agreement or agreed that the terms thereof would apply to his employment with Aquavella, P.C. Nevertheless, defendant acknowledged that he continued performing the same duties in the course of his employment with Aquavella, P.C. as he performed under his employment with Urban Oncology and, indeed, his retirement funds, health and malpractice insurance and other benefits were transferred to Aquavella, P.C. when he entered into the 1998 oral agreement with plaintiffs.

By its verdict, the jury determined that the parties entered into an oral employment agreement that contained all of the terms and conditions of the 1996 written agreement, including the restrictive covenant and liquidated damages provision. The jury further determined that defendant violated the restrictive covenant by opening an office across the street from the practice and awarded damages to Aquavella, P.C. in the amount of $248,798.76 in accordance with the parties' stipulation. Defendant thereafter moved for judgment notwithstanding the verdict or a new trial pursuant to CPLR 4404 (a), contending, inter alia, that the 1998 oral agreement was void pursuant to the statute of frauds. Supreme Court granted that part of defendant's motion for judgment notwithstanding the verdict and dismissed the amended complaint on the grounds that defendant did not admit that the parties orally adopted the terms of the 1996 written agreement and that none of the writings presented by plaintiffs satisfied the statute of frauds. We disagree.

At the outset, we agree with the majority and defendant that the 1998 oral agreement is subject to the statute of frauds inasmuch as the restrictive covenant contained in the 1996 written agreement and orally adopted in 1998 cannot be performed within one year (*see* General Obligations Law § 5-701 [a] [1]). Pursuant to the statute of frauds, "[e]very agreement, promise or undertaking . . . [that, b]y its terms is not to be performed within one year from the making thereof" is "void, *unless it or some note or memorandum thereof be in writing*, and subscribed by the party to be charged therewith, or by his [or her] lawful agent" (*id.* [emphasis added]).

It is well established that "[t]he statute of frauds does not require the 'memorandum . . . to be in one document. It may be pieced together out of separate writings, connected with one another either expressly or by the internal evidence of subject matter and occasion' " (*Crabtree v Elizabeth Arden Sales Corp.*, 305 NY 48, 54 [1953]). "All of [the terms of the contract] must be set out in the various writings presented to the court, and at least one writing, the one establishing a contractual relation-

ship between the parties, must bear the signature of the party to be charged" (*id.* at 55-56). Thus, "[s]igned and unsigned writings relating to the same transaction and containing all the essential terms of a contract may be read together to evidence a binding contract" (*Weiner & Co. v Teitelbaum*, 107 AD2d 583, 583 [1985]; *see Western N.Y. Land Conservancy v Town of Amherst*, 4 AD3d 889, 890 [2004]). Moreover, "parol evidence is admissible to show the connection between the writings and the defendant's agreement to them" (*Western N.Y. Land Conservancy*, 4 AD3d at 890; *see Crabtree*, 305 NY at 55-56).

The sufficiency of the proffered writings should be considered in light of the purpose of the statute of frauds, i.e., "the prevention of successful fraud by inducing the enforcement of contracts that were never in fact made" (4 Corbin on Contracts § 22.1, at 703 [rev ed 1997]; *see Morris Cohon & Co. v Russell*, 23 NY2d 569, 574 [1969]). Thus, "we should always be satisfied with 'some note or memorandum' that is adequate, *when considered with the admitted facts, the surrounding circumstances, and all explanatory and corroborative and rebutting evidence*, to convince the court that there is no serious possibility of consummating a fraud by enforcement. When the mind of the court has reached such a conviction as that, it neither promotes justice nor lends respect to the statute to refuse enforcement because of informality in the memorandum or its incompleteness in detail" (4 Corbin on Contracts § 22.1, at 704).

In our view, the signed and unsigned writings proffered by plaintiffs, when read together and in light of defendant's admissions at trial (*see Crabtree*, 305 NY at 55; 4 Corbin on Contracts § 22.1, at 704), sufficiently satisfy the "memorandum" requirement of the statute of frauds. Here, plaintiffs presented two Letters of Intent from August 1999 and October 1999 that were prepared by defendant's attorney and signed by defendant as the "party to be charged" (*Crabtree*, 305 NY at 55). Those letters, prepared in the context of defendant's negotiations to purchase the assets of Aquavella, P.C., required, as a condition of closing the transaction, "a written termination of *the employment contract between [defendant] and Aquavella[, P.C.], together with a release of all covenants contained therein[ ]* and . . . proof satisfactory to [defendant] that Aquavella[, P.C.] is the sole unencumbered assignee of said contract (named party is Urban Oncology Services, P.C.[, doing business as] 'Eye Care of the Genesee Valley')" (emphasis added). Plaintiffs also presented an unsigned draft asset purchase agreement (APA) from February 2000, which was prepared by defendant's attorney. The APA similarly provided that one of the conditions of the

proposed purchase of the practice by defendant was "[a] written termination *of the employment contract between [defendant] and [Aquavella, P.C.],* as assignee, *together with a release of all covenants contained therein"* (emphasis added).

Although the majority concludes that the aforementioned language in the letters of intent constitutes "an unequivocal attempt by defendant, as part of the due diligence process in the practice purchase transaction, to extinguish any lingering obligations or covenants arising from . . . the 1996 written agreement," defendant repeatedly testified at trial that *"the* employment agreement" referenced in the letters of intent and the APA is the 1998 oral agreement (emphasis added). Indeed, it is undisputed that the *only* employment agreement between plaintiffs and defendant is the 1998 oral agreement. Thus, our conclusion that paragraph 4 (e) refers to the 1998 oral agreement is supported by defendant's own testimony at trial. We therefore conclude that the reference in the letters of intent and the APA to "all covenants contained therein" sufficiently establishes that the oral agreement defendant admittedly made with Aquavella in 1998 incorporated the terms of the 1996 written agreement with Urban Oncology, including the restrictive covenant.

The majority heavily relies upon paragraph 4 (f) of each letter of intent, which requires "written releases executed by [defendant] and . . . Aquavella each releasing the other from any claims relating to the current employment of [defendant]." The majority concludes that "[p]aragraph 4 (f) thereby separately addresses the 1998 oral agreement under which the parties were operating in 1999 . . . ." It is worth noting that defendant made no reference to paragraph 4 (f) at trial or in his post-trial motion and, indeed, defendant did not make that argument in his brief on appeal. In any event, paragraph 4 (f) relates to a mutual release of "claims" arising from defendant's employment, while paragraph 4 (e) specifically refers to "termination *of the* employment contract between [defendant] and Aquavella[, P.C.]" (emphasis added), as well as "a release of all covenants contained therein." Thus, the plain language of the letters of intent does not support the majority's conclusion that "paragraphs 4 (e) and (f) demonstrate that defendant did not agree to incorporate all of the terms and conditions of the 1996 written agreement into the 1998 oral agreement." To the contrary, paragraph 4 (e) provides a clear acknowledgment by defendant that the covenant not to compete set forth in the 1996 written agreement survived the purported termination of his employment by PRG and/or Urban Oncology and that such covenant was incorporated into the 1998 oral agreement with plaintiffs.

In opposition to defendant's post-trial motion, plaintiffs submitted further evidence of the incorporation of the terms of the 1996 written agreement into the 1998 oral agreement by submitting a memorandum that defendant drafted in May 2000, during the course of the parties' negotiations concerning his proposed purchase of the practice. Specifically, defendant wrote that "[c]redited towards the purchase price are moneys owed me under my contract. *My contract stated* that I was to be paid 30% of my collections" (emphasis added). Defendant alleged at trial that he was referring to his 1998 oral agreement with plaintiffs therein. However, the only place where such a provision is "stated" is the 1996 written agreement with Urban Oncology, which provides that defendant's productivity compensation "shall equal 30% of [his] gross patient cash revenue less . . . [his] draw paid[ ] and . . . individual overhead."

Inasmuch as the letters of intent and the APA, together with defendant's testimony at trial, establish the existence of an oral agreement incorporating the terms of the 1996 written agreement, we must determine whether any document or memorandum "contains all of the essential terms of the contract" (*Crabtree*, 305 NY at 57). Here, the 1996 written agreement contains all of the essential terms of the 1998 oral agreement. We note that "[a] written memorandum of one contract ordinarily does not satisfy the statutory requirements with respect to a renewal or other contract made subsequently, although there seems to be nothing to prevent the parties from expressly adopting the old document as the memorandum and authentication of their renewal" (4 Corbin on Contracts § 22.11, at 753). In our view and as the jury determined, the parties orally adopted the 1996 written agreement as the memorandum of the terms of their 1998 oral agreement, and we may therefore look to the 1996 written agreement to supply all of the essential terms of the 1998 oral agreement (*cf. Steinberg v Universal Machinenfabrik GMBH*, 24 AD2d 886, 887 [1965], *affd* 18 NY2d 943 [1966]; *Kastner v Gover*, 19 AD2d 480, 483-484 [1963], *affd* 14 NY2d 821 [1964]).

In sum, we note that " '[t]he [s]tatute of [f]rauds was not enacted to afford persons a means of evading just obligations; nor was it intended to supply a cloak of immunity to hedging litigants lacking integrity; nor was it adopted to enable [a] defendant[ ] to interpose the [s]tatute as a bar to a contract fairly, and admittedly, made' " (*Morris, Cohon & Co.*, 23 NY2d at 574). Here, defendant admitted the existence of the 1998 oral agreement and, indeed, recovered $20,000 in unpaid compensation from plaintiffs pursuant to that oral agreement when the court

granted that part of its motion for summary judgment on the first counterclaim. Moreover, the parties' adoption of the terms of the 1996 written agreement, including the restrictive covenant, is evidenced in two letters of intent signed by defendant and a draft APA prepared by defendant's attorney. We thus cannot agree with the majority that the statute of fraud bars enforcement of the 1998 oral agreement, which was fairly and admittedly made.

We therefore would reverse the order, deny defendant's posttrial motion and reinstate the jury verdict. Present—Scudder, P.J., Peradotto, Carni, Green and Gorski, JJ.